Opinion issued December
23, 2010

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00191-CR

———————————

KIMBERLY
DAWN TRENOR, Appellant

V.

THE STATE OF TEXAS, Appellee



 



 

On Appeal from the 10th District Court

Galveston County, Texas

Trial Court Case No. 07CR3755



 



 

O P I N I O N

          A jury found appellant, Kimberly Dawn
Trenor, guilty of the capital murder of her two-year-old daughter, Riley Ann
Sawyers.  See Tex. Penal Code Ann.
§ 19.03(a)(8) (Vernon Supp. 2009).  The
State did not seek the death penalty, and the trial court sentenced appellant
to life in prison, as statutorily required.  See
Tex. Penal Code Ann § 12.31(a)
(Vernon Supp. 2009).  In two issues,
appellant contends that she was denied compulsory process and that the evidence
was legally and factually insufficient to support her conviction.

          We affirm.  

Background

          On October 29,
2007, a fisherman found a plastic tub in Galveston Bay containing Riley’s body.  Because nothing in the tub identified Riley, she
became known as Baby Grace.  In an effort
to identify her, sketches of Riley were published in the media and on the
Internet.  

          Sheryl Sawyers, Riley’s grandmother who
lived in Ohio, saw a sketch of Baby Grace on the Internet.  Sheryl’s son is Riley’s biological
father.  Sheryl knew that Riley was
living with her mother, appellant, in the Houston area.  Sheryl had not seen Riley for several
months.  She contacted the Galveston
County Sheriff’s Department stating that she believed that Baby Grace was her
granddaughter Riley.  

          At the request of the Galveston County
Sheriff’s Office, a Harris County Sheriff’s deputy went to conduct a welfare
check on Riley.  The deputy spoke to
Royce Ziegler, appellant’s husband and Riley’s stepfather.  Ziegler told the deputy that there was a
custody dispute with Riley’s biological father, who lived in Ohio.  Ziegler stated that a representative from the
Ohio Department of Child Protective Services (CPS) had come to their home,
pushed appellant down, and taken Riley to Ohio. 
Appellant told the deputy the same story.  

          A deputy from the Galveston County
Sheriff’s Office, Deputy Jones, also spoke to Ziegler and to appellant by
telephone.  They told Deputy Jones that
Ohio CPS had forcibly taken Riley. 
Appellant said that she thought Riley was in Ohio with Sheryl or
Sheryl’s sister.  Deputy Jones asked
Ziegler and appellant whether they had any paperwork from Ohio CPS documenting
the taking of Riley.  Ziegler and
appellant said they did and that they would send the deputy the paperwork.  

Through her
attorney, appellant sent the authorities a letter purportedly from Ohio CPS;
however, it was determined that the letter was a fake created by appellant.  It was also determined that there was no open
CPS case on Riley in Ohio.

Deputy
Jones initially believed appellant’s story regarding Riley.  He became suspicious when appellant became
uncooperative and hesitated to file a police report regarding Riley’s
disappearance.  After talking to a
representative with Ohio CPS, Deputy Jones contacted appellant and requested
that she give a DNA sample to eliminate Riley as Baby Grace.  

On November
27, 2007, appellant, accompanied by her attorney, went to the Galveston County
Sheriff’s Office to give a videotaped statement.  Sergeant Berry and Lieutenant Hansen
interviewed appellant.  Appellant told
the officers that, at the beginning of 2007, she met Ziegler on the Internet
playing an on-line game.  She lived in
Ohio, and Ziegler lived in Texas.  Ziegler
came to visit her one time in Ohio, and then she and Riley moved to Texas in
May 2007.  Appellant and Ziegler were
married on June 1, 2007.  

Before she
moved to Texas, appellant was on public assistance and had lived with
Sheryl.  When she and Riley moved to
Texas, things seemed great.  Ziegler had
a job and bought things for Riley. 
Ziegler bought a van for appellant. 
He supported appellant and Riley. 


At first,
Ziegler did not interfere with appellant’s disciplining of Riley.  According appellant, Riley had behavior
problems beyond that of a normal two-year-old. 
Appellant told her that she needed to do more than time-outs to
discipline Riley.  Ziegler told appellant
that she needed to be more aggressive and should start spanking Riley.  Appellant claimed that she would only give
Riley light spankings.  Ziegler then
suggested that appellant start using a belt to spank Riley.  Appellant said that she used the belt to
spank Riley only when Ziegler was present. 
Ziegler also started spanking Riley with a belt.  At one point, Ziegler’s mother saw that
Riley’s bottom was black and blue.  She
told appellant and Ziegler that they needed to use their hands, not a belt, to
spank Riley.  

          Appellant explained to the deputies
that Ziegler stayed home from work on July 25, 2007.  Ziegler was not sick, but told appellant that
he was staying home to ensure that she was disciplining Riley.  Ziegler told appellant that if Riley started
misbehaving, then appellant should “go for the belt.”  

Because
Riley said “I want” rather than “Please can I have,” Ziegler instructed
appellant to get the belt.  Ziegler told
appellant, “We need to break her.”  Ziegler
told Riley that she needed to say “yes, sir,” and “yes, ma’am.”  This was in the morning.  

Throughout
the day, appellant used the belt to whip Riley. 
Ziegler hit Riley with the belt for not saying or doing what he wanted
or when she screamed.  Ziegler would also
shove Riley’s head face down in a pillow.  Ziegler told appellant that they needed to do
more because Riley continued to scream.  He
instructed appellant to run cold water in the bathtub.  Appellant complied and filled the bathtub
half full with water.  Ziegler said that
the next time Riley screamed they would put her in the bathtub.  Appellant told the deputies that Riley
naturally screamed because of the way Ziegler was hitting her with the
belt.  

When Riley
continued not to do or say what Ziegler wanted, Riley was hit with the belt and
her head was shoved under the water in the bathtub.  When Riley would scream, she would be put
back into the cold water.  Appellant said
that Ziegler hit Riley with the belt wherever her skin was exposed, including
her back and her legs.  Appellant
confirmed that Riley was naked during the beatings.  

At some
point the beatings stopped.  They laid
Riley on ice packs to soothe her bruised body. 
They also gave her Tylenol. 
Ziegler said that they had done enough for that day.  Riley was awake and trying to recover.  But soon, Ziegler started beating Riley
again.  Ziegler got a different belt,
which was thicker and hurt Riley more.  Appellant
stated that Ziegler hit Riley as hard as he could.  

Appellant
also told the deputies that Ziegler grabbed Riley by her hair and dragged her
into the bathroom to submerge her in the cold water.  When Riley would run away, Ziegler would put the
belt around her neck and drag her back to where he had told her to stand.  Appellant described how Ziegler would pick
Riley up and throw her across the room or onto the tile floor.  Appellant said that she heard Riley hit the
floor very hard at least one time.  She
described hearing a “smack” when Riley hit the tile floor.  Appellant believed that appellant threw Riley
on the floor a couple more times. 
Appellant also said that at one point, Ziegler bit Riley.

Appellant
denied throwing Riley.  Appellant did
admit to hitting Riley with the belt and to holding her head under the water in
the bathtub.  Appellant stated that one
time when she was hitting Riley with the belt, Riley told her that she loved
her.  Appellant said that the beating
stopped briefly, but when Riley said it again, Ziegler told appellant that
Riley was saying it to control appellant and make her stop hitting Riley with
the belt.  

Appellant
told the deputies that after one of the times that Ziegler used the belt to pull
Riley back, Riley could not stand up. 
Appellant said that it appeared Riley did not have control over her legs
anymore.  Appellant told that deputies
that this concerned her.  But Ziegler
said that it was “just another act” to get them to stop beating her.  Ziegler said that Riley was pretending.  

Appellant
stated that eventually Riley could no longer stand.  At Ziegler’s request, appellant got the
Tylenol.  Ziegler gave Riley the
medicine.  Riley had trouble chewing and
swallowing.  Ziegler then realized that
Riley was not faking.  

According
to appellant, she told Ziegler that they needed to call for help and get Riley
to the hospital.  Ziegler said that they
could not call because they would go to jail. 
Appellant indicated that Riley’s body was black and blue from the
beatings.  

Riley
stopped breathing, and Ziegler performed CPR. 
Appellant said that Riley’s heart was beating but she was not
breathing.  Ziegler thought that maybe
she had Tylenol stuck in her throat.  He
stuck his finger in her throat but could find nothing.  Ziegler then told appellant to do the same,
but she could not feel anything either.  When
asked, appellant confirmed that Riley did not gag when they had put their
fingers down her throat.  

Appellant
sat on the couch, and Ziegler put Riley in appellant’s arms.  Appellant told the detectives that eventually
Riley’s heart stopped beating, and she died in her arms.  Appellant said that she could feel Riley go
cold.  

After she
died, Ziegler placed Riley in the bathtub and covered her with a towel.  Ziegler told appellant that they needed to
clean up and get rid of the belts and the pillow.  He told her that they needed to go to the
store and buy bleach and trash bags.  

That same
night, appellant and Ziegler went to Walmart. 
They each pushed a shopping cart. 
Appellant told the deputies that they purchased a blue plastic storage
container, a chain, quick dry cement, bleach, plastic gloves, a roll of trash
bags, a clip to fasten the chain, and a shovel. 


When they
returned home, Ziegler put on a pair of plastic gloves and went in the bathroom.  Ziegler told appellant that he scrubbed Riley
with bleach to remove any fingerprints. 
He also told her that he poured bleach into Riley’s mouth and down her
throat to remove any saliva that may be left from performing CPR.  

Appellant insisted
that they dress Riley.  After she was
dressed, appellant held open three separate trash bags while Ziegler put
Riley’s body inside the bags.  At
Ziegler’s request, appellant got a cup for water, which Ziegler used to mix the
quick cement inside the blue plastic storage container.  Ziegler then put Riley into the container and
placed the container outside in a storage shed. 


Appellant
told the deputies that Riley’s body stayed in container in the storage shed for
one to two months.  During this time,
Ziegler’s family asked about Riley’s whereabouts.  Appellant and Ziegler lied.  They said that Riley was staying with
appellant’s aunt and uncle in Plainsville, Texas because of the custody battle
with Sheryl and Riley’s father in Ohio. 

Appellant
also told the deputies that she and Ziegler made two night-time attempts to
dispose of Riley’s body.  The first night
she and Ziegler drove to an area with a dirt road.  Ziegler stopped and began to dig a hole with
a shovel in a field.  After a while, Ziegler
abandoned the attempt telling appellant that it would take too long to dig the
hole.  In the second attempt, appellant
and Ziegler drove to Lake Houston to drop Riley off a bridge.  Appellant then pointed out to Ziegler that
the container with Riley inside may land on the ground and not in the
water.  For this reason, they did not
dispose of Riley’s body that night.

On another
night, appellant and Ziegler drove to Galveston with Riley’s body.  Appellant was driving appellant’s truck.  Appellant drove down near Galveston Bay, and Ziegler
took the container with Riley’s body in it and put in the bay.

Appellant
told the detectives that Ziegler had never been violent with her either before
or after Riley’s death.  She told the
detectives that she was not physically afraid of Ziegler after Riley’s death,
but she was afraid that he might leave her with nothing.  

Appellant
further stated that appellant had attempted suicide the previous weekend by
taking an overdose of pills.  She also
said that she had attempted suicide that weekend by taking sleeping pills.

Appellant
said that, after Riley was killed, Ziegler had disposed of all the items that
he associated with her death.  Appellant
also said that after Baby Grace was found, Ziegler threw away the remaining
items that belonged to Riley, such as her clothes and toys.

After
appellant’s statement, the police picked up Ziegler.  He also gave a statement.  In his statement, Ziegler blamed appellant
for Riley’s death.  

Appellant
was later indicted for capital murder related to Riley’s death.  Among the State’s evidence was appellant’s
videotaped statement.  The forensic
evidence at appellant’s trial included the testimony of Dr. Stephen Pustilnick,
the medical examiner who had performed Riley’s autopsy.  

Dr.
Pustilnick testified that Riley’s body was in an advanced state of
decomposition when he conducted the autopsy. 
There were no signs of bruising to Riley’s skin, but he stated that was
not surprising given the decomposition.  Dr.
Pustilnick explained that he could not tell whether Riley had been drowned or
had been asphyxiated because of her advanced state of decomposition.  In other words, the doctor could neither
confirm nor eliminate drowning or asphyxiation as possible causes of Riley’s
death.  

Dr.
Pustilnick testified that he saw damage to Riley’s vertebrae.  This damage indicated to Dr. Pustilnick that
Riley’s neck had likely suffered multiple hyperflexions.  

Dr.
Pustilnick also told the jury that Riley’s brain appeared pink.  This indicated that she had suffered a
subdural hemorrhage.  Dr. Pustilnick told
the jury that his examination revealed that Riley had three skull fractures.  He explained that these type of skull
fractures result from events such as being tossed off a roof or being thrown
with force into something.  He testified
that such injuries do not occur from a simple slip-and-fall accident.  The doctor told the jury that any one of
these three skull fractures could have caused Riley’s death.  Dr. Pustilnick determined that the cause of
Riley’s death was blunt force trauma and that the manner of her death was
homicide.  

Based on
the evidence admitted at trial, the trial court instructed the jury that it could convict appellant of
capital murder on any one of three bases: (1) as the principal actor; (2) as a
party to the offense; or (3) under conspirator liability.  The jury returned a general verdict of guilt
for capital murder.  The State did not
seek the death penalty, and the trial court sentenced appellant to life in
prison as statutorily required.  

Raising two issues, appellant now
appeals her conviction.  

Compulsory
Process

          In her first issue, appellant contends
that she was “deprived of her constitutional right of compulsory process.”  

          At trial, the defense called Ziegler to
testify regarding a suicide note that he had written.  Ziegler’s counsel informed the trial court
that, upon questioning, Ziegler planned to invoke his constitutional privilege
against self-incrimination.  

          Outside the presence of the jury, the
defense asked Ziegler several questions. 
Ziegler refused to answer the questions, asserting his right against
self-incrimination.  At that point, the
trial court stated, “It is clear to the Court that he is going to invoke his
Fifth Amendment right to any questions resulting from this incident and the
Court sees no reason to proceed further.” 
Defense counsel responded, “If that’s the court’s ruling, nothing
further from the defendant.”

          On appeal, appellant contends, for the
first time, that she was denied her state and federal right to compulsory
process.  She writes, “At the time of
appellant’s trial, the appellant’s constitutional right to compulsory process
was in direct conflict with Royce Ziegler’s constitutional right against
self-incrimination.”  Appellant
acknowledges that an individual’s constitutional privilege against
self-incrimination overrides a defendant’s constitutional right to compulsory
process of witnesses.  Bridge v. State, 726 S.W.2d 558, 567
(Tex. Crim. App. 1986).  Nevertheless,
appellant requests this Court to reverse her conviction and to allow the trial
court to grant testimonial immunity to Ziegler allowing him to testify in aid
of appellant’s defense on retrial.  

          The Sixth Amendment provides that
“[i]n all criminal prosecutions, the accused shall enjoy the right . . . to
have compulsory process for obtaining witnesses in his favor.”  U.S.
Const. amend. VI.  Although this
constitutional right is fundamental, compulsory process is not an absolute
right and may be waived by a defendant’s failure to attempt to exercise it.  See
Whitmore v. State, 570 S.W.2d 889, 897 (Tex. Crim. App. 1976) (citing Washington v. Texas, 388 U.S. 14, 19, 87
S. Ct. 1920, 1923 (1967)); Pinkston v.
State, 744 S.W.2d 329, 335 (Tex. App.—Houston [1st Dist.] 1988, no pet.).  We agree with the State that appellant has not
preserved her compulsory process complaint for appeal.  

For a party
to preserve a complaint for appellate review, the record must reflect that the
complaining party made a timely, specific request, objection, or motion to the
trial court.  Tex. R. App. P. 33.1(a).  This rule ensures that a trial court has the
opportunity to correct mistakes at the time they are alleged to have been made.
 Hull
v. State, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002).  Here, appellant did not object at trial that
she was being denied her compulsory process rights.  Nor did she make the request to the trial
court that she now makes on appeal: to grant immunity to Ziegler to allow him
to testify.  To the contrary, when the
trial court stated that it saw no point in continuing the defense’s examination
of Ziegler in light of his assertion of privilege, defense counsel responded,
“If that’s the court’s ruling, nothing further from the defendant.”  We conclude that appellant has waived her
compulsory process complaint.  See Tex.
R. App. P. 33.1(a).  

Even if
appellant had preserved her complaint, appellant’s argument is without
merit.  In Texas, a trial judge may grant
immunity to a witness only with the consent of the State.  Graham
v. State, 994 S.W.2d 651, 654 (Tex. Crim. App. 1999).  There is no indication in the record that the
State consented to immunity for Ziegler.

We overrule
appellant’s first issue.  

Sufficiency
of the Evidence

In her second issue, appellant contends that
the evidence was legally and factually insufficient to support her conviction
for capital murder.  Appellant asserts
that the evidence failed to show that she possessed the requisite culpable
mental state to support a conviction for capital murder.

A.      Standards of Review

This Court
reviews sufficiency-of-the-evidence challenges applying the same standard of
review, regardless of whether an appellant presents the challenge as a legal or
a factual sufficiency challenge.  See Ervin v. State, No. 01–10–00054–CR,
2010 WL 4619329, at *2–4 (Tex. App.—Houston [1st Dist.] Nov. 10, 2010, pet. filed) (construing majority
holding of Brooks v. State,
PD-0210-09, 2010 WL 3894613, at *14, *21–22 (Tex. Crim. App. Oct.6, 2010)).  This standard of review is the standard
enunciated in Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). 
See id.  Pursuant to this standard, evidence is
insufficient to support a conviction if, considering all the record evidence in
the light most favorable to the verdict, no rational fact finder could have
found that each essential element of the charged offense was proven beyond a
reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789
(1979); In re Winship, 397 U.S. 358,
361, 90 S. Ct. 1068, 1071 (1970); Laster
v. State, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We can hold evidence to be insufficient under
the Jackson standard in two
circumstances: (1) the record contains no evidence, or merely a “modicum” of
evidence, probative of an element of the offense, or (2) the evidence
conclusively establishes a reasonable doubt.  See
Jackson, 443 U .S. at 314, 318 n.11, 320, 99 S. Ct. at 2786, 2789 n.11,
2789; see also Laster, 275 S.W.3d at
518; Williams, 235 S.W.3d at 750. 

The sufficiency-of-the-evidence
standard gives full play to the responsibility of the fact finder to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.  See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  An
appellate court presumes that the fact finder resolved any conflicts in the
evidence in favor of the verdict and defers to that resolution, provided that
the resolution is rational.  See Jackson, 443 U.S. at 326, 99 S. Ct.
at 2793.  In viewing the record, direct
and circumstantial evidence are treated equally; circumstantial evidence is as
probative as direct evidence in establishing the guilt of an actor, and
circumstantial evidence alone can be sufficient to establish guilt.  Clayton,
235 S.W.3d at 778.  Finally, the
“cumulative force” of all the circumstantial evidence can be sufficient for a
jury to find the accused guilty beyond a reasonable doubt.  See
Powell v. State, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

B.      Law
of the Offense

          A person commits the offense of murder
if he “intentionally or knowingly causes the death of an individual.”  Tex.
Penal Code Ann. § 19.02(b)(1) (Vernon 2003).  A person commits the offense of capital murder
if he commits the offense of murder as defined in section 19.02(b)(1) and “the
person murders an individual under six years of age.”  Tex. Penal Code Ann. §
19.03(a)(8).  

          The Penal Code provides that a person
is criminally responsible as a party to an offense if the offense is committed
by his own conduct, by the conduct of another for which he is criminally
responsible, or by both.  Tex. Penal Code Ann.  § 7.01(a) (Vernon 2003).  The Penal Code further provides that a person
is criminally responsible for an offense committed by the conduct of another
if, acting with intent to promote or assist the commission of the offense, she
solicits, encourages, directs, aids, or attempts to aid the other person to commit
the offense.  Tex. Penal Code Ann. §
7.02(a)(2).  When a party is not the
primary actor, the State must prove conduct constituting an offense plus an act
by the defendant done with the intent to promote or assist such conduct.  Beier v.
State, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985); Miller v. State, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet.
ref’d).

In
determining whether a person acted as a party, the fact finder may consider
events occurring before, during, and after the commission of the offense and
may rely on the person’s actions showing an understanding and a common design
to commit the prohibited act.  See Payne v. State, 194 S.W.3d 689, 694
(Tex. App.—Houston [14th Dist.] 2006, pet. ref’d) (citing Ransom v. State, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)).  The evidence must show that at the time of the
offense, the parties were acting together, each contributing some part toward
the execution of their common purpose.  Escobar v. State, 28 S.W.3d 767, 774
(Tex. App.—Corpus Christi 2000, pet. ref’d).  Evidence is sufficient to convict under the
law of parties if the defendant is physically present at the commission of the
offense and encourages its commission by words or other agreement.  Ransom,
920 S.W.2d at 302.  Participation as a
party in a criminal offense may be inferred from circumstances and need not be
shown by direct evidence.  Scott v. State, 946 S.W.2d 166, 168
(Tex. App.—Austin 1997, pet. ref’d).  

In this case, the trial court instructed the jury that
appellant could be found guilty as a party to the offense.  In this regard, the court charged the jury as
follows:

If you find from the
evidence beyond a reasonable doubt that on or about [the] 25th day of July 2007
in Galveston County, Texas, ROYCE CLYDE ZEIGLER, II, did then and there
intentionally or knowingly cause the death of Riley Ann Sawyers, an individual
under six years of age, by throwing the said Riley Ann Sawyers onto the floor
or by holding the said Riley Ann Sawyers under water or by holding the said
Riley Ann Sawyers’ mouth and nose against a pillow or by a manner and means
unknown to the Grand Jury and you further believe from the evidence beyond a
reasonable doubt that on said date in said County and State, the Defendant
KIMBERLY DAWN TRNOR AKA KIMBERLY DAWN ZEIGLER, acting with the intent to
promote or assist the commission of Capital Murder by ROYCE CLYDE ZEIGLER, II, solicited
or encouraged or directed or aided or attempted to aid the said ROYCE CLYDE
ZEIGLER, II, in intentionally or knowingly causing the death of Riley Ann
Sawyers, an individual under six years of age, by the said ROYCE CLYDE ZEIGLER,
II, throwing the said Riley Ann Sawyers onto the floor or by holding the said
Riley Ann Sawyers under water or by holding the said Riley Ann Sawyers’ mouth and
nose against a pillow or by a manner and means unknown to the Grand Jury, then
you will find the Defendant KIMBERLY DAWN TRENOR AKA KIMBERLY DAWN ZEIGLER
guilty of Capital Murder . . . .

 

C.      Sufficiency
Analysis

          Appellant makes no assertion that the
evidence failed to show that Ziegler intentionally or knowingly caused the
death of Riley.  Instead, appellant
contends that the evidence is insufficient to support the jury’s guilty verdict
because the evidence failed to show that she had the required intent to kill
Riley.  In this regard, it appears that
appellant is challenging her conviction under the State’s theory that she was the
primary actor.  As mentioned, the charge also
authorized the jury to convict appellant based on her culpability as a party to
the offense and as a co-conspirator.  

          We now examine the evidence to
determine whether it is sufficient to support appellant’s conviction as a party
to the offense.  If it is, we need not
determine whether the evidence also supports appellant’s conviction based on
the other two theories.  When a court’s
charge authorizes the jury to convict on more than one theory, the verdict of
guilty will be upheld if the evidence is sufficient on any one of the theories.
 Guevara
v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992).

          The evidence presented at trial shows
that, on the morning of July 25, 2007, Ziegler said to appellant, “We need to
break [Riley].”  Thereafter, appellant
assisted and aided Ziegler in beating and abusing Riley.  In her videotaped statement, appellant
admitted that she hit Riley with a belt and held Riley’s head under the water
in the bathtub.  Appellant confirmed in
her statement that the beating and abuse of Riley lasted the whole day; that
is, appellant indicated that the beating lasted from the morning until Riley
died in the late afternoon.  

          Although she denied throwing Riley,
appellant admitted seeing Ziegler throw Riley onto the tile floor.  She heard Riley hit the floor very hard, and
she saw the back of Riley’s head hit the floor. 
Despite this knowledge, appellant did nothing to stop the abuse or to
get help for Riley.  To the contrary, the
evidence is such that the jury could have reasonably inferred that appellant
continued to assist in Riley’s beating by continuing to beat and abuse Riley herself
even after she saw Ziegler throw Riley onto the tile floor.  

          The evidence further showed that appellant
filled the bathtub with water at Ziegler’s direction.  This was the water in which Ziegler and
appellant submerged Riley throughout the day. 
The evidence also showed that, at Ziegler’s direction, appellant fetched
the Tylenol that Ziegler gave to Riley.  

          The evidence also revealed that
appellant was aware that Riley was in serious need of medical attention and
decided to take no action.  In her
statement, appellant described how Riley no longer had control and use of her
legs.  Appellant said to Ziegler that
they should get Riley to the hospital. 
When Ziegler pointed out that they would go to jail, appellant made no
effort to get help for Riley.  Even when
Riley stopped breathing, appellant made no attempt to get medical assistance
for her child.  

          The
evidence further showed that, after Riley died, appellant assisted in
concealing Riley’s death.  The evidence
showed that she went shopping with Ziegler for the supplies used to cover up Riley’s
death.  Appellant assisted Ziegler in
putting Riley in the trash bags, which were then placed in the storage
container.  

          Appellant accompanied Ziegler on his
two failed attempts to dispose of Riley’s body. 
Appellant also drove Ziegler’s truck on the night that they finally
disposed of Riley’s body in Galveston Bay. 
After getting rid of her body, appellant lied to her own family, to her
in-laws, and ultimately to authorities regarding Riley’s whereabouts.  To further the ruse, appellant drafted a fake
letter to support the story concocted by her and Ziegler that Riley had been
taken by Ohio CPS.  

To show
that evidence at trial was not sufficient to support a finding that she had the
requisite intent to support a capital murder conviction, appellant cites the
testimony of the medical examiner, Dr. Pustilnick, and the testimony of another
of the State’s medical experts, Dr. Harrell Gill-King, a forensic
anthropologist.  Appellant points out
that the doctors’ testimony indicated that Riley’s skull fractures would not
have been externally apparent to appellant. 
More specifically, Dr. Pustilnick confirmed that the post-mortem
examination of Riley revealed that her scalp was not lacerated or bruised.  When asked, Dr. Gill-King confirmed that, as
a layperson, appellant could not have simply looked at Riley and known that she
had a subdural hematoma or have been reasonably certain that she would die from
her injuries.

          A review of all the evidence reveals
that, in addition to the testimony cited by appellant, Dr. Pustilnick also
testified regarding the progression of symptoms a person experiences after
suffering a subdural hematoma.  He stated
that, as part of this progression, a person will lose the ability to stand, no
longer have a gag reflex, stop breathing, and ultimately die.  

          As pointed
out by the State, this is exactly what appellant described in her statement
with regard to what she saw Riley experience. 
She saw that Riley had lost control of her legs, could not stand, and
had no gag reflex.  Appellant then
observed that Riley had stopped breathing. 
Dr. Pustilnick testified that a person observing such symptoms would
know that the person experiencing the symptoms was in need of medical
attention.  

          In any event, the jury could have
reasonably inferred that appellant had the requisite intent under the law of
parties.  Under that theory, the State
had to show that appellant, acting with intent to promote or assist the
commission of the offense, solicited, encouraged, directed, aided, or attempted
to aid Ziegler to commit the offense of capital murder.  See Tex. Penal Code Ann. § 7.02(a)(2).
 As discussed, the evidence showed that
appellant aided and actively participated in the day long abuse of Riley that
only ended with her death.  Given the
level and duration of physical trauma inflicted on Riley, the jury could have
reasonably inferred that appellant acted with the intent to promote or to assist
the commission of the offense by aiding and attempting to aid Ziegler in his
commission of the offense of capital murder. 
See id.

          Appellant also points to the testimony
of FBI agent B. Stone, who conducted a forensic search of the computers used by
Ziegler and appellant.  Agent Stone
testified on cross-examination that he found no evidence research had been
conducted before Riley’s death on the computers that would indicate appellant
was planning to kill or to injure Riley. 
While such testimony aided in appellant’s defense, ample evidence, as
discussed, exists in the record to support the State’s theory that appellant had
the requisite intent under the law of parties. 
Regardless of whether appellant had previously researched how to harm
Riley, the evidence showed that appellant had the requisite intent at the time
of the offense.   

          Lastly, appellant points to a
statement she made during her videotaped interview.  Appellant told the deputies, “I feel bad
about what had happened.  I never meant
for it to happen.”  Appellant’s statement
is not enough to render the evidence insufficient to prove intent.  See
Sells v. State, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003).  As the exclusive judge of witness credibility
and the weight to be given such testimony, the jury is free to believe or to disbelieve
any portion of a witness’s testimony.  See Jones v. State, 984 S.W.2d 254, 258
(Tex. Crim. App. 1998).  Accordingly, the
jury, here, was free to believe or disbelieve all or part of appellant’s statement.
 See
id.

          Viewing all the evidence, direct and
circumstantial, in the light most favorable to the jury verdict, we conclude
that a rational fact finder could have found, beyond a reasonable doubt, all of
the essential elements of the offense, including intent.  See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  More precisely, a rational jury could have
found, beyond a reasonable doubt, that appellant, acting with the intent to
promote or to assist the commission of the offense, aided or attempted to aid Ziegler
to commit the offense of capital murder. 
See Tex. Penal Code Ann. § 7.02(a)(2).  We hold that the evidence
was sufficient to support the judgment of conviction.

          We overrule
appellant’s second issue.  

Conclusion

We affirm
the judgment of the trial court.

 

 

                                                                   Laura
Carter Higley

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and Bland

Publish.   Tex. R. App. P. 47.2(b).