# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00526-CR

**Shane Miller, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 9014089, HONORABLE DONALD HUMBLE, JUDGE PRESIDING

Following an early morning skirmish between two vehicles, the passenger in a white Jeep fatally shot the driver of a red Nissan. The fourteen-year-old passenger, Skyler Miller, pleaded guilty to the murder and was sentenced to confinement for twenty-five years.[1] His eldest brother, Shane Miller, was driving the Jeep. The State alleged that appellant was criminally responsible as a party because his driving facilitated the shooting. The jury found appellant guilty of murder and the trial court sentenced him to serve thirty years in prison. On appeal, Shane Miller contends that the evidence is legally and factually insufficient to establish that he had the intent to promote or assist his brother≈s commission of the offense. He also complains that the trial court erred in denying his motion for mistrial. We hold that any error regarding the motion for mistrial was not preserved, and that the evidence is legally and factually sufficient to uphold the conviction.

---

[1] There is a suggestion in the record that Skyler was adjudicated as a juvenile, but the record is unclear on this point.

## BACKGROUND

Around 2:30 a.m. on October 14, 2000, Nathan Skeen and Jennifer Applewhite were shot at the intersection of Slaughter Lane and Mopac while stopped at a red light. The single .44 magnum bullet passed through Skeen=s left forearm, entered his left temple, exited his right temple, and finally came to rest in Applewhite=s right thigh. Skeen=s wounds were immediately fatal; Applewhite was taken to the hospital, treated, and released. As appellant has challenged the legal and factual sufficiency of the evidence, we will detail the facts leading up to the shooting.

Twenty-year-old Shane Miller was married to Debra Jones; the young couple had a baby daughter. One source of contention in their relationship was the amount of time Shane[2] spent with his two brothers, the middle brother Sean and the youngest, fourteen-year-old Skyler. Debra testified that all three brothers were very close and were together almost every day. Skyler and Shane were especially close. Skyler testified at trial that he looked up to Shane as a father figure and that he wanted to be just like Shane. Debra testified that Skyler would do things to impress Shane. The amount of time Skyler and Shane spent together, coupled with Shane=s intense jealousy, led Debra to announce shortly before the incident occurred that she was leaving Shane; she also made an appointment with a divorce lawyer. Shane was upset and angry that Debra was leaving him.

The Miller parents had been divorced for many years and the three brothers had been raised by their mother. The week before the shooting, Shane drove Skyler to their father=s house where

---

[2] For the sake of clarity, at times we will refer to the family members by their first names.

they stole a loaded .44 caliber revolver from a drawer. Skyler testified that he took the gun because it was Aexciting@ and made him feel Alike a big shot@; he took it back to the house where he lived with his mother and hid it in an air conditioning vent. Shane lived in a duplex with his wife and baby, but frequently visited his mother=s house. Both brothers were admittedly Aobsessed@ with the gun. Shane testified that Skyler played with the loaded gun all week. Shane never cautioned Skyler about playing with a loaded weapon and, indeed, often handled the gun himself. Skyler testified that during that week, he either talked about the gun or showed it to people several times. Harris Degnan, a friend of the brothers, testified that sometime before October 13th, Skyler had showed him the gun, which Skyler had stuck in his pants= waistband. Degnan testified that Skyler Afelt big@ with the gun and told him, ANo one is going to mess with the [Miller] boys tonight.@ Witnesses for the State testified that a .44 caliber gun is a large, powerful weapon, and that the police prefer to carry smaller weapons because a .44 caliber is heavy and has too much force and recoil when fired.

Both Shane and Skyler had experienced the gun=s force prior to the events of October 14. During the day of October 13, Shane was brooding about the impending breakup of his marriage and went to Bowie High School, where Skyler was a freshman, and got him out of class. They went to Shane=s duplex where Shane announced his marital troubles seeking Skyler=s sympathy. Later, the brothers went to their mother=s home, where Skyler retrieved the gun and began playing with it. When Shane grabbed the gun, it went off and a bullet discharged through an open window. Shane testified that the gun was loud and very powerful, with a lot of recoil. They hurriedly replaced the gun in the air conditioning vent and left the house.

**3**

After taking Skyler back to school, Shane hung out with some other friends because he was too upset to be alone. Later that evening, he received a phone call from his friend Degnan, who told him that Debra was not at home with the baby but had gone out to a party. Shane was so upset that he asked his brothers to go with him to check on his wife. At the large public party, Shane confronted Debra and Acaused a scene.@ Sean and Skyler waited outside. Shane returned shortly, angry after his fight with Debra; the three brothers left together in Shane=s Jeep and headed for his duplex. Later, around two in the morning, Debra called Shane and arranged to come to the duplex to pick up some clothes before she returned to her mother=s house, where she and the baby planned to spend the night. Debra told Shane that she did not want Sean or Skyler there when she came. Shane wanted to see her and agreed to take his brothers home before she arrived. Skyler testified that he resented being forced to leave his brother=s house because of Debra. The Miller brothers piled in the Jeep and Shane began driving toward their mother=s house.

Meanwhile, Skeen and Applewhite were headed home from a party they had attended in Buda. Skeen was driving westbound on Slaughter Lane in Applewhite=s red Nissan, and she was in the passenger seat. About 2:30 a.m., Skeen encountered the white Jeep traveling in the same direction. Shane was driving, Sean was in the back seat, and Skyler was riding in the front passenger seat. Skyler had placed the large pistol, which he had been carrying all evening, on his lap. There is conflicting testimony as to who was the aggressor, but it is undisputed that the two drivers began sparring with each other on the road. Steve Krumwiede, a truck driver who collects rubbish, was making his early morning rounds on Slaughter Lane. He testified that when he passed Bowie High School, he noticed two cars engaged in a

**4**

conflict. Specifically, he testified that both cars were proceeding at a slow rate of speed and that the red car, at least two or three times, switched lanes and then braked in front of the Jeep in order to keep it from passing. Applewhite testified that she drifted in and out of sleep, but woke up to see bright lights close behind and hear Skeen say, AThese guys are on my ass.@

Krumwiede next saw the two vehicles at a stoplight in front of the high school. He watched as the red car accelerated and witnessed the Jeep Aimmediately pursue[] the red car.@ Krumwiede testified that the Jeep had an opportunity to Adisengage@ from the altercation at that time, but instead its driver chased after the red car. Detective Robert Merrill testified that from his investigation it appeared that the Jeep was the initial aggressor, but that the driver of the red car then responded in kind. After both vehicles left the high school at a high rate of speed, Krumwiede in his slower truck temporarily lost sight of them.

The Nissan stopped at a red light at the intersection of Slaughter Lane and Mopac; the Jeep pulled up on the left side of the stopped car. Skyler testified that he was angry at the driver of the red car for swerving at his big brother=s Jeep. Skyler testified that he looked over and saw the driver of the red car laughing at them. Skyler picked up the pistol in both hands and aimed at the driver. Skeen apparently ducked when he saw the gun and raised his arm defensively, but when he came back up Skyler fired the pistol, fatally wounding Skeen. Applewhite felt the bullet in her leg and then saw the blood coming from Skeen=s nose, mouth, and ear. There were no other witnesses to the shooting.

Shane sped away from the scene. He later told Debra that he would never forget Skeen=s wounded face, but he testified that his only concern was for himself and his brothers, who were quickly identified as suspects. Sean, who was never charged with a crime, was subsequently released from

**5**

custody, but Shane and Skyler were detained by the police. When Shane initially spoke to the police, he lied about his involvement, saying he was Areally drunk@ at the time. Sean later admitted that he threw the gun in the Pedernales River; the police searched the river but never found the murder weapon.

Shane was charged as a party to the offense of murder. *See* Tex. Pen. Code Ann. ' 19.02(b).[3] **The State=s indictment alleged three alternative means of murder as set out in section 19.02(b). At trial, the State focused on the felony-murder charge as recited in the third paragraph of the indictment. It was stipulated at Shane=s trial that Skyler was the shooter; the State=s theory was that Shane was criminally responsible as the driver.** *See id.* ' 7.02(a)(2) (West 1994). **Specifically, the State alleged at trial that Shane was a party to the felony offense of dangerous conduct,** *i.e.***, discharging a deadly weapon, because he acted with the intent to facilitate the offense by driving his vehicle, which allowed Skyler to shoot into the victim=s car.** The jury found Shane guilty and the trial court sentenced him to thirty years= confinement. Shane urges that the evidence is legally and factually insufficient to convict him as a party to the offense of murder. In his third

---

[3] A person commits an offense if he:

(1)intentionally or knowingly causes the death of an individual;

(2)intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3)commits or attempts to commit a felony, other than manslaughter, and in the course of and furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. Tex. Pen. Code Ann. ' 19.02(b) (West 1994).

point of error, Shane asserts that the trial court erred in failing to grant his motion for a mistrial after a State=s witness made an inadmissible statement that Shane argues was extremely prejudicial and calculated to inflame the jury.

## DISCUSSION

*Law of Parties*

According to the law of parties, each party to an offense may be charged with the commission of the offense. *Id.* ' 7.01(b). A person is a party to an offense if Aacting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.@ *See id.* ' 7.02(a)(2). Appellant was a party to the murder of Skeen if he acted with the intent to promote or assist Skyler with the deadly conduct of knowingly discharging the loaded gun at the car occupied by the victim and his girlfriend.

When a party is not the Aprimary actor,@ the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). The evidence can be deemed sufficient to sustain a conviction under the law of parties if the evidence shows that the defendant was physically present at the commission of the offense and encouraged the commission of the offense either by words or other agreement. *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim. App. 1978); *see also Urtado v. State*, 605 S.W.2d 907, 911 (Tex. Crim. App. 1980). Since an agreement between parties to act together in a common design can seldom be proved by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to

7

establish an understanding or a common design to commit the offense. *Pesina v. State*, 949 S.W.2d 374, 383 (Tex. App.C San Antonio 1997, no pet.). The agreement, if any, must be prior to or contemporaneous with the criminal event, *see id.* at 382; but in determining whether one has participated in an offense, the court may examine the events occurring before, during, and after the commission of the offense. *Beier*, 687 S.W.2d at 3-4. Circumstantial evidence may suffice to show that one is a party to the offense. *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977). Finally, while mere presence at the scene, or even flight, is not enough to sustain a conviction, such facts may be considered in determining whether an appellant was a party to the offense. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1981) (op. on reh=g); *Guillory v. State*, 877 S.W.2d 71, 74 (Tex. App.C Houston [1st Dist.] 1994, pet. ref=d).

*Legal Sufficiency*

When the court reviews the legal sufficiency of a verdict, it does so in the light most favorable to the verdict to determine whether a rational finder of fact could have found all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). The jury as trier of fact is entitled to resolve any conflicts in the evidence, to evaluate the credibility of witnesses, and to determine the weight to be given any particular evidence. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found that appellant was a party to the offense of deadly conduct, resulting in the

8

death of Skeen. Applewhite testified that Shane tailgated the victim=s car, and Krumwiede testified that Shane pursued the red car after it sped away from the stop light at the high school. The day after the incident, Skyler told Debra that Shane Arode up on them@ at Mopac and Slaughter Lane.[4] Applewhite testified that the driver of the Jeep pulled along the left side of her car Avery slowly@ before the passenger fired the fatal shot. Shane immediately fled the scene in his Jeep. If we view the evidence in the light most favorable to the verdict, this is some evidence that appellant aided Skyler by positioning the Jeep to facilitate the shooting.

Appellant=s participation in events before, during, and after the offense also strongly supports the element of intent. *See Guillory*, 877 S.W.2d at 74 (AAn appellate court may look . . . to events before, during and after the commission of the offense in determining whether an individual is a party.@). Shane was with Skyler when he took the loaded pistol from his father=s house, and he helped conceal that fact from both parents. Shane knew that Skyler idolized him and tried to impress him, and that having the gun made Skyler feel Atough.@ Shane and Skyler played with the gun together, and Shane knew the power of the weapon because he had accidentally shot the gun himself. He also knew that Skyler had the loaded gun on his lap during the on-road conflicts with the victim=s car. The testimony that the red car was cutting off the Jeep

---

[4] Debra volunteered to wear a body wire so that she could secretly record her conversations with her husband and his brothers the day after the offense. The jury heard a tape of Debra=s conversation with Skyler, who told her that Shane Arode up on them@ at the light.

and braking in front of it supports an inference that Shane, as well as Skyler, might have been angry or frustrated with the driver of the red car. Shane told Debra that Skyler shot the victim Abecause he was talking shit.@ Furthermore, Skyler testified that Awe knew what was going to happen if we pulled up to them,@ suggesting that there was a common understanding or that Shane and Skyler were of like mind before the shooting. Debra testified that Shane and Skyler consistently backed each other up and that Shane knew what to expect from Skyler. Debra also testified that immediately after the murder, Shane told her, AWe settled a score.@ The evidence supports a finding that Shane knew how Skyler would react in most circumstances. Shane did nothing to discourage Skyler=s fatal reaction to the driver of the red car who angered Skyler by cutting off his brother=s Jeep. Shane=s actions in driving the JeepC tailgating, pursuing, and pulling up slowly to the left of the aggressive vehicleC while the loaded gun rested on his brother=s lap, along with Skyler=s comments that A*we* knew what was going to happen,@ and Shane=s own admission to Debra that A*we* settled a score,@ would permit a rational juror to find beyond a reasonable doubt that there was a common purpose in committing the felony of deadly conduct. We overrule appellant=s first point of error.

*Factual Sufficiency*

In determining the factual sufficiency of the elements of the offense, the reviewing court Aviews all the evidence without the prism of >in the light most favorable to the prosecution,= and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.@ *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). The

evidence may also be factually insufficient to support a criminal conviction if the evidence in support of the existence of a vital fact, standing alone, is factually too weak to support it. *Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001); *Johnson*, 23 S.W. 3d at 11. In conducting its factual sufficiency review, an appellate court reviews the fact finder=s weighing of the evidence and is authorized to disagree with the fact finder=s determination. *Clewis*, 922 S.W.2d at 133. However, appellate courts should exercise their fact jurisdiction only to prevent a manifestly unjust result. *Id.* at 135. Appellate courts are not free to reweigh the evidence and set aside a jury verdict merely because the reviewing judges feel that a different result is more reasonable. *Id.* A factual sufficiency review must employ appropriate deference to the fact finder=s role as the sole judge of the weight and credibility to be given to witness testimony. *Johnson*, 23 S.W.3d at 7.

Shane and Skyler repeatedly testified that they did not speak at all in the car prior to or during the commission of the offense. They both denied that Shane knew what Skyler was contemplating or that he agreed to the commission of the offense. However, given a fair reading of the record, the jury may well have doubted their credibility after Shane admitted that he and his brothers had planned to lie to their mother, the police, their aunts and their friends about their involvement in the murder. He admitted that he Awas trying to make up a story@ when he told police that he was really drunk and unable to clearly recall the details of the incident. The jury heard that Shane told his wife that he would protect her by denying that he ever spoke to her the evening of the murder. Furthermore, Skyler did not give an official statement or testimony

11

relating to the crime until after he pleaded guilty and was sentenced. The jury could have disbelieved Skyler when he took all of the blame for the shooting to protect his big brother. In short, the jury could have assessed the credibility of the brothers= testimony and found it wanting.

Moreover, the jury could have determined that Skyler=s testimony that there was no conversation in the car during the events leading up to the shooting was not credible. While Skyler testified that he was getting mad and Aexcited@ as the skirmish with the red car escalated, he denied that he or his brothers said anything before or after he shot the driver of the red car. The jury could have disbelieved Skyler=s testimony that he was the only one in the car who was upset by the other car=s aggressive behavior. The jury could have decided that it was not credible that Shane, the driver whose movement was being blocked by the red car=s braking and changing of lanes, was not upset as well. Indeed, Shane testified that in response to the red car=s threatening driving, he had commented, AWhat is this guy thinking?@ This testimony belied Skyler=s contention that nobody said anything and also reflected that Shane was annoyed or frustrated by the other car=s aggressive driving. There was a series of aggressive actions, some by the red car and some by the Jeep as well. Krumwiede testified that he could not discern which car was the instigator, and Detective Merrill stated that while the Jeep may have initially provoked the red car, the red car became the aggressor at some point during the conflict. The jury could have disbelieved Shane=s testimony that he was not provoked to anger in the midst of such a situation.

The jury had already heard evidence of appellant=s threatening personality. Jacob Frank and Nathaniel Frank, two brothers who attended Bowie High School with him, described their run-ins with Shane and testified that he became angry when anyone stood up to him. Both Frank brothers testified that Shane had threatened to get back at them. Debra testified that Shane was intensely jealous; just a few hours earlier at the party he had been screaming and cursing at her and was furious that she was not wearing her wedding band. Debra testified that Shane called her several times and vehemently warned her not to tell anyone about his and Skyler=s involvement in the murder. Based on the testimony, the jury may well have determined that it was not just Skyler who wanted to exact revenge on the other driver. Indeed, in asking one of his friends if he had heard about a shooting the night before, Shane stated that someone was shot over Aroad rage.@ This comment exhibits his awareness of an anger-provoking incident on the road; having heard evidence that Shane had a pattern of threatening those who crossed him, the jury could have believed that he as the driver shared the passenger=s intent to get even or that he intentionally drove the Jeep in a manner that assisted his brother=s deadly act. Moreover, the jury heard Debra testify that as soon as she drove by the crime scene on her way to pick up Shane, she immediately thought, AOh, my God, what did they do?@ Debra felt compelled to assist the police in apprehending Shane and Skyler. This evidence reflected that Shane=s own wife had little doubt that her husband had participated in the shooting and indicates that those who knew him well knew that Shane was vindictive when provoked.

**The evidence that the State relied on to prove intent was not so greatly outweighed by contrary evidence or so weak standing alone as to render the verdict unjust. Krumwiede, an unbiased observer, testified that the Jeep had an opportunity to disengage but instead Apursued@ the victim=s car. Skyler also testified that when the red car accelerated, the Jeep took off. Skyler said, AI was hoping to [see the red car again].@ Only Shane, as the driver of the Jeep, could fulfill Skyler=s wish to catch up to the red car. Moreover, the jury heard Skyler=s taped conversation with Debra describing how Shane Arode up on@ the red car. It is undisputed that Shane knew Skyler had the loaded gun on his lap and knew its capacity for destruction. Shane also admitted that he knew Skyler, who was sitting right next to him, was upset. Skyler had become upset earlier when Shane disclosed his marital problems. Skyler testified that he was also angry that Debra told Shane to make his brothers leave the duplex before she would come home. Therefore, Shane knew Skyler was upset and emotional, even before the cat-and-mouse maneuvers with the red car further provoked him. In his recapped comments to Debra, Skyler reflected the tension of the situation.** The jury heard Skyler describe the incident this way:

> Skyler: He (inaudible) brakes. This dude (inaudible) and we were likeCwe felt weird about everything. We were like let=s just get home. Something f--ed up=s going to happen. Let=s get home, let=s get home. This dude pulled out in front of us right when we were standing there. He started braking, braking, braking. And then we tried to change lanes and just go because we knew what was going to happen if we pulled up to them. We tried to change lanes and just go. He got in front of us and braked again, and then he got in the other lane and burnt off. We were like f--. And we pulled up to that stop light, and I reached over and I shot him, and heCthatCand then we burnt off.

At trial, Shane testified that he was not mad at the occupants of the other car and did not wish to injure them, although he was frustrated by what he described as a situation he could not control. He was in a hurry to deliver his brothers to their home and return to the duplex before Debra arrived. Shane testified that he was nervous because he had outstanding traffic warrants and was fearful of getting stopped by the police with the loaded weapon. It may have been this situation to which he was referring, or the aggressive driving, when he testified that if the police had witnessed the situation, AWe would have gotten pulled over and went to jail.@

Shane=s testimony is some evidence to suggest that his only intent was getting to his mother=s house and that is why he pulled into the lane left of the red car. However, that evidence is not so overwhelming as to make manifestly unjust an inference that Shane was provoked into driving his vehicle in a manner that reflected his own intent to retaliate against those in the red car, who slowed him down when he was in a hurry to meet Debra. There is evidence that Shane could have disengaged from the altercation but chose to pursue the other vehicle. Skyler testified that he was angry at the red car and hoped that they would catch up to it. The jury may reasonably have inferred that Shane made it possible for Skyler to catch up to the red car and take his deadly shot. Without Shane=s particular driving actions, Skyler would never have been in a position to shoot the driver who had taken off at a high rate of speed.

Moreover, Skyler admitted that Awe knew what was going to happen if we pulled up to them@ at the light. This phrase is another fact that supports the inference of a common design or understanding between the shooter and the driver. Furthermore, the jury heard several

**15**

different witnesses describe the brothers as having a Acommon identity.@ Detective Merrill testified that the Millers thought of themselves as having a Acollective we@ mentality. Shane=s cellmate for a time, William McCandless, testified that Shane told him that the Miller brothers saw Aeye-to-eye@ and that they would stick together. He bragged that Aall their stories would stay straight.@ As additional evidence of a common purpose, McCandless testified that Shane told him, AThis was a good sign to his wife about leaving him.@ The jury could infer that Shane was referring to what he did to people who crossed him. McCandless felt moved to contact the district attorney about Shane=s comments.

The weight of the evidence suggests that the offense did not happen as suddenly or as spontaneously as Shane and Skyler testified. Skyler said that he saw the victim laughing before he fired the shot. The evidence indicated that the victim ducked after seeing the gun and came back up before Skyler actually shot him. Shane testified that he saw Skyler reach for the gun and admitted that he did not try to stop him. Skyler=s timing as he waited to shoot the victim strongly suggests that Shane, at the very least, realized what was happening and did nothing to prevent or discourage the shooting. Shane, too, looked over at the car long enough to see the victim=s face and note that Athere was some bitch with him.@ Shane admitted to his wife that the victim was shot Abecause he was talking shit,@ which is some evidence of a retaliatory motive or intent. He later told her, A*We* settled a score,@ strongly indicating his own intent to assist or participate in the offense. Shane denied that he made that statement, but Debra testified with

**16**

particularity that those were his words. It was for the jury to assess the credibility of the conflicting evidence.

It is undisputed that Shane was present at the scene and attempted to flee with his brothers. Additionally, Shane helped Skyler take the gun from their father=s house. Shane allowed his fourteen-year-old brother to handle and carry a powerful and deadly weapon the same evening he confided in him about Shane=s own marital problems. Shane facilitated Skyler=s act of discharging the gun at the offending car by chasing it and pulling up beside it at the red light. Skyler=s act would not have been possible without Shane=s involvement, which, the jury could have determined, contributed to a dangerously volatile set of circumstances. The jury heard evidence that Shane had a temper and threatened those who crossed him. The jury could have believed that Shane, as the driver, deliberately continued the conflict and positioned the Jeep to enable Skyler to shoot the gun. The events before, during, and after the commission of the offense support the inference of a common design between Shane and Skyler to commit the felony offense of deadly conduct. *See Guillory*, 877 S.W.2d at 75 (jury could infer common design for robbery from facts that appellant lived with perpetrator, they were together before and after offense, and were in possession of stolen property when arrested). After reviewing the evidence as a whole in a neutral light, but with appropriate deference to the jury=s assessment of credibility, we conclude that the evidence is not factually insufficient. We overrule Shane=s second point of error.

*Motion for Mistrial*

In his third point of error, Shane asserts that the trial court erred in failing to grant his motion for a mistrial after a State witness made an inadmissible statement that Shane argues was prejudicial and calculated to inflame the jury. **The following exchange, occurring during the State=s direct examination of Detective Richard Faithful, refers to Debra:**

Q.  When you saw her, what was she afraid of?

A.  She was afraid of retaliation from her husband.

[DEFENSE COUNSEL]:  I am going to object to that, your honor.  It is a totally improper question.  There is no predicate laid for any of those issues at this point.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  And ask the jury be instructed to disregard that.

THE COURT:  You will disregard the last statement, ladies and gentlemen.

[DEFENSE COUNSEL]:  I think I am required by law to move for mistrial, your Honor.

Q.  (By Mr. Ward) Detective Merrill [sic], would you please describe the demeanor of Debra when you went and met her at her parent=s house?

A.  She was very scared for her safety as well as that of her mother, which is her mother=s house.

To preserve the issue for appellate review, appellant should have actually moved for a mistrial and requested a ruling and, if the court refused to rule, he should have objected to the court=s refusal to rule.  *See* Tex. R. App. P. 33.1(a).  Appellant urges that his counsel=s statement, AI think I am required

by law to move for a mistrial,@ was in fact a motion for a mistrial.  However, it does not request or seek any action by the court.  Assuming that it was a proper and timely motion, the appellant failed to obtain a ruling from the court, thus nothing is presented here for review.  *See id.*; *Hull v. State*, **67 S.W.3d 215, 217 (Tex. Crim. App. 2002).  Appellant urges that since the trial continued on after his Amotion,@ the motion was implicitly denied.  *See Gutierrez v. State*, 36 S.W.3d 509, 511 (Tex. Crim. App. 2001) (remanding case because lower court had not considered whether record indicated that implied ruling was made).**

**To preserve error for review, a defendant must receive an adverse ruling on his objection and the ruling must be conclusive; that is, it must be clear from the record that the trial judge in fact overruled the defendant=s objection, or error is waived.  *Powell v. State*, 897 S.W.2d 307, 310 (Tex. Crim. App. 1994).  A trial court=s ruling on a motion may be implied when the court=s actions or statements unquestionably indicate a ruling.  *See Rey v. State*, 897 S.W.2d 333, 336 (Tex. Crim. App. 1995).  In most cases where a motion was found to be implicitly overruled, the trial judge took some affirmative action that clearly indicated a ruling.  *See, e.g.*, *Chappell v. State*, 850 S.W.2d 508, 509-10 (Tex. Crim. App. 1993) (ruling on defendant=s objection to second jury shuffle occurred when court granted State=s motion to shuffle venire); *Beebe v. State*, 811 S.W.2d 604, 605 (Tex. Crim. App. 1991) (counsel=s Ainartful@ statement to trial court in pre-trial hearing that Awe would be entitled at this time, Judge, to more time to prepare ourself for trial [sic],@ combined with judge=s response that the case would be tried the next morning, indicated both request and adverse ruling).  Here, the trial judge made no response to appellant=s counsel=s**

comment that he thought he was required to move for a mistrial before the State=s questioning of the witness resumed. Appellant=s counsel did not clearly request a ruling, nor did he object to the court=s silence on his alleged motion. We cannot say that the court implicitly overruled his motion, so he has not preserved the matter for review. In any event, the trial court=s instruction to the jury to disregard the answer sufficiently cured any error. *See Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 121 S. Ct. 1407 (2001).

## CONCLUSION

Because **the evidence in this case is both legally and factually sufficient to support the verdict, we affirm the judgment of conviction.**

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Patterson

Affirmed

Filed: July 26, 2002

Publish