**Opinion issued July 19, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-17-00320-CR

————————————————

## GEORGE RAFAEL AGUILAR, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1497176**

---

## MEMORANDUM OPINION

A jury convicted appellant, George Rafael Aguilar, of murder, and the trial court sentenced him to sixty-seven years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In his sole point of error, appellant

contends that the evidence is legally insufficient to establish his guilt as a party.to the offense of murder. We affirm.

## Background

On December 4, 2012, Officer Clinton Shafer with the Pasadena Police Department responded to a dispatch call regarding a shooting. When he arrived at the scene, Officer Shafer observed a maroon Scion parked in front of a Houston Garden Center, with both front doors open.

When he approached the vehicle, Officer Shafer saw four individuals inside: Joe Aguilar, who was driving, Yolanda Aguilar, his wife, slumped over on his shoulder, three-year old Joe Aguilar, III, behind the driver's seat, and Kimberly Aguilar, the child's mother, in the rear passenger seat. Officer Shafer testified that Yolanda was not moving and did not appear to be breathing. Based on Joe's information, Officer Shafer broadcast a call for a Jeep Cherokee occupied by appellant and his brother, Adrian Aguilar.

Detective Sylvia Trevino with the Pasadena Police Department, who assisted in the investigation, testified that she went to the La Quinta hotel across the street to determine if there was any video surveillance of the incident. Officer Trevino recovered video footage which showed appellant's SUV following Joe's vehicle.

Detective Raymond Sorrell with the Pasadena Police Department testified that he and his partner received information that the suspects' vehicle might be at a trailer

2

park in Pasadena or La Porte and they began checking trailer parks for a brown Jeep Cherokee. After the suspect's vehicle was located, Officer Sorrell followed the Jeep Cherokee as it left the trailer park. He observed a female, later identified as Elaine Garza, driving the vehicle and testified that she later pulled into a Valero gas station in La Porte. Officer Sorrell testified that La Porte police officers arrived at the gas station and instructed the driver to exit the vehicle with her hands up and walk toward the officers. He further testified that as the female was complying, appellant came around from behind the gas station with his hands up, as if to surrender, and yelled to get the officers' attention. Officer Michael Cooper, Detective Sorrell's partner, testified that the man who came from behind the building with his hands up said, "I'm George. I'm the one you're looking for." Appellant was then handcuffed and placed in the back of a police car.

Elaine Garza testified at trial that she and appellant had been living together in appellant's trailer for five years at the time of the shooting. Garza testified that, on the morning of the shooting, appellant had returned to the trailer and was upset after seeing Joe and Yolanda, Garza's aunt. Appellant told Garza that they had laughed at him and that he was "tired of it." Garza testified that she made breakfast while appellant went to the trailer next door to get Adrian, his brother. After breakfast, appellant told Garza that he and Adrian were going to town, and they left together in appellant's Jeep. Later, Garza's mother called her, crying, and told her

3

that Yolanda had been killed. Garza testified that she called appellant to tell him what happened, and that appellant was not upset and told her that he did not know anything. Appellant and Adrian returned home and later left again in another vehicle.

Sometime later, appellant called Garza and told her to pick him up at a Valero gas station and bring some clothes. When she arrived at the gas station, appellant asked her to return to the trailer and get some bullets from the living room cabinet. Garza returned to the trailer but was unable to get in because she did not have the key. When Garza called appellant to tell him, appellant told her to return to the gas station. As Garza was driving the Jeep back to the gas station, she noticed a La Porte police car behind her with its siren activated. Garza called appellant back to tell him about the police car, and appellant told her to continue driving to the gas station. When she arrived, police instructed her to get on the ground. Appellant then emerged and was arrested.

Joe Aguilar testified that he and appellant had had a verbal altercation on the morning of the shooting. Joe testified that he was driving behind appellant when appellant stopped in the middle of the intersection and began "cussing [him] out real bad." As Joe began to drive around him, appellant said, "I'm going to cap you, son-of-a-bitch, mother fucker." Joe then told appellant, "fuck you," and Yolanda said,

4

"Let's go, let's go." Joe testified that appellant then gestured to him which Joe understood as a threat that appellant was going to shoot him.

A short time later, Joe and Yolanda went to pick up their daughter-in-law, Kimberly, and her son, "Baby Joe," and take Kimberly to work. As they were driving, Joe noticed that appellant was following them in his Jeep. Joe testified that appellant followed him for at least fifteen minutes and then drove up on the driver's side of Joe's car. Joe then saw Adrian, who was in the backseat of appellant's Jeep, hang out of the Jeep and fire four or five rounds at the driver's side of Joe's vehicle. After the shots were fired, appellant looked back at them before speeding up and driving away. When the police arrived, Joe told them that appellant and Adrian had done it.

Detective Michael Young with the Pasadena Police Department testified that the Jeep Cherokee was registered to appellant. After appellant was arrested, he was taken back to the trailer and signed a consent form to search his trailer.

Detective Jonathan Jernnigan with the Pasadena Police Department testified that he participated in the search of appellant's trailer. In the course of the search, Detective Jerrnigan found a .410 shotgun, one box of .25-caliber ammunition, and two boxes of .22-caliber ammunition.

Officer Matthew Britain with the Pasadena Crime Scene Unit arrived at the crime scene and processed Joe's vehicle. He observed a bullet hole in the rear

5

passenger window, and he recovered one bullet from the driver's side door pillar and one from the cargo area of the vehicle. Officer Britain also took DNA swabs from several locations in the vehicle.

Diana Wolfshol, a DNA analyst with the Harris County Institute of Forensic Sciences (HCIFS), analyzed the DNA swabbings taken from appellant's vehicle. She testified that appellant could not be excluded from the DNA profile found on the gear shift of the Jeep Cherokee.

Jason Schroeder, an HCIFS trace evidence analyst, analyzed the results of appellant's gunshot residue tests. Schroeder testified that the samples taken from appellant's left hand, shorts, shirt, and a black plastic bag recovered from the cargo area of the Jeep revealed particles consistent with gunshot residue.

Dawn LaPorte, an HCIFS firearms examiner, examined the five projectiles recovered during the investigation and determined that they were all fired from the same .25-caliber handgun. She testified that the box of .25-caliber ammunition recovered from appellant's trailer contained bullets with the same weight and characteristics as the five projectiles recovered during the investigation.

Dr. Dwayne Wolf, deputy chief medical examiner for Harris County, testified that the results of the autopsy showed that the complainant died from multiple gunshot wounds.

**Sufficiency of the Evidence**

In his sole point of error, appellant contends that the evidence is legally insufficient to establish his guilt as a party to murder. Specifically, he argues that there was insufficient evidence of a prior or contemporaneous plan between appellant and the actual shooter to commit the complainant's murder. He further argues that there was no evidence that appellant did anything to assist the commission of the offense.

## A. Standard of Review

We review appellant's challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We examine all of the evidence in the light most favorable to the jury's verdict to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789 (emphasis in original); *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *See Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). An appellate court determines "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). In viewing the record, direct and circumstantial evidence are treated equally. *Id.* at 13. An appellate court presumes that the factfinder resolved any conflicting inferences in favor of the verdict and defers to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793.

## B. Applicable Law

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01 (West 2011). A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2). Therefore, "to establish liability as a party, the State must show that, at the time of the commission of the offense, the parties were acting together, each contributing in some way to the execution of their common purpose." *Murchison v. State*, 93

8

S.W.3d 239, 256 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (citing *Ex parte Welborn*, 785 S.W.2d 391, 394 (Tex. Crim. App. 1990) (en banc)).

When a party is not the "primary actor," the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985) (en banc); *Miller v. State*, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet. ref'd). Evidence is sufficient to sustain a conviction under the law of parties if it shows that the defendant was physically present at the commission of the offense and encouraged the commission of the offense either by words or other agreement. *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim. App. [Panel Op.] 1978); *Hoang v. State*, 263 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Since an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense. *Miller*, 83 S.W.3d at 314. The agreement, if any, must be made before or contemporaneous with the criminal event, but in determining whether one has participated in an offense, the court may examine the events occurring before, during, and after the commission of the offense. *Beier*, 687 S.W.2d at 3–4; *Miller*, 83 S.W.3d at 314. Circumstantial evidence may suffice to show that one is a party to an offense. *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App.

9

1977); *Miller*, 83 S.W.3d at 314. While mere presence at the scene, or even flight, is not enough to sustain a conviction, such facts may be considered in determining whether an appellant was a party to the offense. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. [Panel Op.] 1979); *Hoang*, 263 S.W.3d at 22.

## C. Analysis

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found that appellant was a party to the offense of murder. The evidence shows that appellant had a verbal altercation with Joe on the morning of the shooting. During the altercation, appellant cussed at Joe and told him, "I'm going to cap you, son-of-a-bitch, mother fucker." Appellant then gestured at Joe which Joe understood as a threat that appellant was going to shoot him. *See Jaggers v. State*, 125 S.W.3d 661, 669–70 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (finding testimony that defendant had talked about killing complainant was admissible to show his motive and intent to kill her). After appellant returned to his trailer, he was upset and told Garza that Joe and Yolanda had laughed at him and that he was "tired of it." *See Miller*, 83 S.W.3d at 310, 312 (finding evidence sufficient to sustain defendant's conviction as party to offense of deadly conduct where, among other things, evidence supported inference that shooter and defendant might have been angry or frustrated at driver of other car for swerving at defendant's Jeep and that shooter had seen driver of other car laughing at them). Appellant then

10

had a conversation with Adrian in appellant's trailer and they left together in appellant's Jeep.

Later, while Joe and Yolanda were driving Kimberly to work, Joe saw appellant driving behind him. Appellant followed them for at least fifteen minutes before driving up on Joe's driver's side. Adrian, who was in the backseat of appellant's Jeep, was hanging out and fired four or five rounds at the driver's side of Joe's vehicle, killing Yolanda. After the shots were fired, appellant looked back at them before speeding up and driving away. The physical evidence also shows gunshots struck the driver's side of Joe's vehicle and multiple gunshot wounds to Yolanda. *See Hoang*, 263 S.W.3d at 23 (holding evidence was legally sufficient to sustain defendant's conviction for murder as party to offense where evidence established defendant assisted shooter by giving him loaded firearm that killed complainant, driving his car parallel to, close to, and at about same speed as complainant's car, and enabling shooter to be in position to shoot complainant accurately and repeatedly); *Miller*, 83 S.W.3d at 314 (finding evidence legally sufficient to establish defendant as party to offense of deadly conduct resulting in complainant's death where witnesses testified that defendant pursued victim's car and pulled up along left side of her car "very slowly" before passenger fired fatal shot).

11

The jury also heard testimony that appellant asked Garza to go to the trailer and get the bullets from the living room cabinet. The jury could infer this to be an effort to cover up the crime. *See Hoang*, 263 S.W.3d at 23 (finding evidence showing that defendant drove shooter away from location after shooting and tried to cover up crime by instructing shooter's girlfriend not to tell anyone what had happened supported defendant's conviction to murder as party to offense).

Appellant contends that this case is similar to *Gross v. State*, 380 S.W.3d 181 (Tex. Crim. App. 2012). There, the defendant was convicted of murder and sentenced to ten years' in prison. *See id.* at 183. The court of appeals reversed the judgment of the trial court and rendered a judgment of acquittal. *See id.* On petition for discretionary review, the Court of Criminal Appeals affirmed the court of appeals's judgment. *See id.* at 189. It held that the court of appeals had properly determined that the evidence presented against the defendant was insufficient to support his conviction for murder under the law of parties. *See id.* at 188. In particular, it noted that although the defendant was present at the crime scene and possessed the murder weapon, there was no evidence that (1) the defendant had anticipated that the person he was with would shoot the victim, (2) the defendant had assisted or encouraged the shooting, or (3) the defendant and the shooter had a prior or contemporaneous plan to commit the murder. *See id.* at 186–88.

*Gross* is distinguishable from the present case.  As discussed above, appellant made statements and took actions before, during, and after the shooting that demonstrates that he and Adrian were working together to accomplish their common purpose of shooting at Joe and Yolanda, and ultimately killing Yolanda.  *See Beier*, 687 S.W.2d at 3–4 (noting that, in determining whether one has participated in offense, court may examine events occurring before, during, and after commission of offense).  Viewed cumulatively, we conclude that a rational jury could have found beyond a reasonable doubt that appellant encouraged and aided Adrian to commit the offense of murder.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Williams*, 235 S.W.3d at 750.

Accordingly, we hold that the evidence is legally sufficient to sustain appellant's conviction for murder as a party to the offense.  Appellant's sole point of error is overruled.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

Do not publish.   TEX. R. APP. P. 47.2(b).

13