# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00251-CR

---

**Jerome Yancey, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 460TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-19-300876, THE HONORABLE SELENA ALVARENGA, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury found Jerome Yancey guilty of murder, and the trial court assessed the sentence at forty years in prison. *See* Tex. Penal Code § 19.02(c). Appellant contends that the evidence is insufficient to have proved beyond a reasonable doubt that he promoted or assisted the commission of an aggravated robbery or murder. We will affirm.

## BACKGROUND

Appellant went with two other men to the hotel room of Jannerra Antwaun Williams. Appellant testified that he was planning to buy marijuana from Williams and that one of the men wanted to pick up his girlfriend. Instead, there was an "explosion" and Appellant's group fled the hotel. The State's theory of the case was that Appellant was part of a group that set out to rob Williams, and that in the process one of the group killed Williams.

Austin Police Department officer Nathan Taylor responded to a report of an explosion at the hotel and three males and a female fleeing. He found Williams dead from a gunshot wound to the head in the doorway of Room 318. Taylor found a shell casing just outside the room. The medical examiner testified that Williams died from a gunshot to his head fired from less than three feet. Williams's mother identified him as the victim in the photos of the scene.

The bulk of the testimony and evidence relevant to the issue on appeal came from APD Detective Joshua Griggers, Appellant, hotel surveillance video, Appellant's recorded statement, and text messages between Williams and a conspirator. Appellant testified in his own defense.

**APPLICABLE LAW**

When reviewing the sufficiency of the evidence in a criminal case, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). We "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. The jury as factfinder is the sole judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The factfinder "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *Stahmann*, 602 S.W.3d at 577, and is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences

2

from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

When considering a claim of evidentiary insufficiency, we do not sit as the thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023). Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (quoting *Murray v. State*, 457 S.W.3d 446, 448-49 (Tex. Crim. App. 2015)). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

The court instructed the jury that it could find Appellant guilty of felony murder as a party. A person commits felony murder by performing "an act clearly dangerous to human life that causes the death of an individual" in the course of and in furtherance of the commission of a felony other than manslaughter. Tex. Penal Code § 19.02(b)(3). A person is criminally

3

responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. *Id.* § 7.01(a). The State sought to prove Appellant's guilt under Texas Penal Code subsections 7.02(a) or 7.02(b). *See id.* § 7.02. Section 7.02(a)(2) permits finding a defendant criminally responsible for an offense committed by another if the defendant acted with intent to promote or assist the commission of the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other person to commit the offense. *Id.* § 7.02(a)(2). Section 7.02(b) provides:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).[1]

The law of parties may be applied to a case even though no such allegation is contained in the indictment and "[t]his rule applies not only to the law of parties found in Section 7.02(a)(2) [of the Penal Code] but also the law of parties found in Section 7.02(b)," *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989).

"Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery." *Ervin v. State*, 333 S.W.3d 187, 201 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (quoting *Love v. State*, 199 S.W.3d 447,

---

[1] After the date alleged in the indictment, the Legislature amended Penal Code § 7.02(b) to add the following language at the end: "In this subsection, 'conspiracy' means an agreement between two or more persons to commit a felony." Act of May 24, 2023, 88th Leg., R.S., ch. 735 § 1, 2023 Tex. Gen. Laws 1780, 1780. That amendment, applicable only to offenses committed on or after September 1, 2023, did not apply to this case. *See id.* §§ 2, 3.

453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)).  In determining whether the accused participated as a party, the court may look to events occurring before, during, and after the commission of the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).

Since an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense. *Miller v. State*, 83 S.W.3d 308, 314 (Tex. App.—Austin 2002, pet ref'd); *see Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977) (holding that circumstantial evidence was sufficient to show defendant's guilt as party).  Presence at the scene may be considered in determining whether a defendant was a party to the offense, but mere presence at the scene without more is insufficient to prove guilt as a party. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1979) (op. on reh'g); *Miller*, 83 S.W.3d at 314.

## DISCUSSION

Appellant contends that the evidence is insufficient to support beyond a reasonable doubt a finding that he promoted or assisted the commission of an aggravated robbery or murder.  Though he quotes Penal Code Section 7.02(a)(2) and (b) when setting out the applicable law, he focuses his discussion on the sufficiency of the evidence under the theory of criminal responsibility of parties defined by Penal Code Section 7.02(a)(2).  He does not challenge the sufficiency of the evidence to support party responsibility under Penal Code Section 7.02(b).

Alternate pleading of the differing methods of committing an offense may be charged in one indictment. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

5

"When the charge authorizes the jury to convict the defendant on more than one theory . . . the verdict of guilt will be upheld if the evidence is sufficient on any theory authorized by the jury charge." *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013). When multiple methods of commission are charged and the jury returns a general verdict, the appellant must challenge each of the theories in order to gain reversal of the judgment. *Kitchens*, 823 S.W.2d at 259. In *Kitchens*, the trial court charged the jury that it could find appellant guilty of capital murder by proving murder in the course of either aggravated sexual assault or robbery; the appellant challenged the sufficiency of the evidence only as to the assault theory, and the Court of Criminal Appeals held that, "[b]ecause appellant does not contest the sufficiency of the evidence to prove a murder in the course of robbery his last point of error is overruled" without conducting a sufficiency review of the robbery theory. *Id.* at 259.

Here, Appellant challenged the murder conviction by arguing that the evidence was insufficient to prove that he was responsible as a party who acted with intent to promote or assist the commission of the murder, by soliciting, encouraging, directing, aiding, or attempting to aid the other person committing the offense. *See* Tex. Penal Code § 7.02(a)(2). He does not raise an issue challenging the sufficiency of the evidence to support a conviction under Section 7.02(b), which permitted conviction upon proof beyond a reasonable doubt that the murder occurred in the course of and in furtherance of the attempt to carry out a conspiracy to commit aggravated robbery and that the murder should have been anticipated as a result of carrying out the conspiracy. *See* Tex. Penal Code § 7.02(b). We can affirm the judgment on this basis.

Even if Appellant's arguments are broad enough to encompass the Section 7.02(b) theory of parties, the evidence is sufficient to support the jury's verdict. *See Brickley v. State*, 623 S.W.3d 68, 75-76 (Tex. App.—Austin 2021, pet. ref'd) (noting that appellate courts

6

normally "'refrain from conducting a sufficiency of the evidence review when the defendant fails to attack all theories of conviction submitted alternatively to the jury'" but addressing sufficiency "in the interests of justice"). Appellant points to his testimony that he intended to buy marijuana from Williams and did not know that his companions planned to commit a crime of theft, assault, robbery, or murder. He asserts that there was no direct evidence of conspiracy or his knowledge of a criminal scheme and that the evidence did not provide a sufficient basis for the jury to infer such conspiracy or knowledge.

Griggers testified that Williams contacted Doris Walker through a dating website in the afternoon of May 5, 2019. After a series of messages she agreed to meet Williams in his hotel room to "hang out and smoke together." She asked Williams if he was alone; he was. Williams got someone to pick up Walker. Griggers testified that Walker was a girlfriend of Timothy Bowie, Appellant's friend since middle school. Bowie was also friends with Roosevelt Haynes, whom Appellant did not know. Walker entered Williams's room at about 7:35 p.m. according to the hotel's video. The video was a compilation from various hotel cameras; the one showing the door to Williams's room was from the opposite end of the half of the atrium surrounding the pool.

At 7:46 p.m., Haynes drove a vehicle into the hotel's parking lot with passengers Bowie and Appellant. The car drove around the parking lot for around two minutes passing many open spots before backing into one. Griggers testified that this was "consistent with suspicious behavior" because those about to commit a crime will look for cameras, easy access to the vehicle, and avenues of escape. The vehicle had no rear license plate, indicating to Griggers that the occupants were concealing their identities in preparation for committing a crime. Griggers testified that Bowie grabbed something at his waistline while getting out of the

7

car, which Griggers deduced based on later video was a handgun; he said some people tuck their guns into their waistband and will need to check for its presence and adjust it.

Appellant followed his companions into the hotel lobby at 7:51 p.m. and walked to the elevators without looking at the front desk; Griggers testified that this behavior indicated that the group had been contacted by someone who told them where to go in the hotel. As the elevator doors closed, Bowie lifted his shirt revealing what Griggers said was a pistol in his waistband. Griggers testified that, in his experience, a person bringing a pistol to a hotel where he is not staying is likely coming to commit a robbery. They went to Williams's room at 7:52 p.m. and waited outside the door. Before the door opened, Bowie pulled his shirt over his face and Haynes pulled his hood over his head; Griggers testified that these actions indicated they were hiding their identities in preparation for a robbery.

At 7:56 p.m., Walker left the room. The three men were so close to the door they had to move out of her way. The men then entered the room as Walker continued to walk away. The men were in the room for four seconds, with Appellant stepping past the threshold for only a second. There was no sound on the video, but something startled Walker and she began to move faster and Appellant and the other men ran down the stairs. Griggers testified that Appellant was covering his face with his shirt to conceal his identity and that both Bowie and Haynes were carrying handguns and covering their faces. Appellant found a side door and disappeared from the video. Bowie and Haynes left through the front lobby. Haynes was wearing a latex glove on his hands that he did not have on previously that he dropped by the car door before he and Bowie drove away.

Police pulled a still photo of Appellant from the hotel camera and publicized him as a person of interest. They found and arrested Appellant; he did not turn himself in. Griggers

8

interrogated Appellant, a recording of which was played for the jury. Griggers testified that Appellant said the trio were going to pick up Bowie's girlfriend. Appellant testified that Bowie and Walker were communicating by text. In the hotel, they heard an explosion and ran. Griggers pointed out several conflicts between Appellant's report and Griggers's observations of the video. In the interview, Appellant said he never saw the woman they were there to pick up, though the video showed her walk past him when he was standing outside the door. In the interview, Appellant said that they did not go into the room, but the video showed he did. Appellant said he heard an explosion as they walked toward the room, but the video showed that he entered the room briefly and ran away. Appellant told Griggers that being named a person of interest "spooked" him; Griggers said that people wrongly accused normally soon call police and explain. When Griggers confronted Appellant about discrepancies between the hotel video and Appellant's responses at the interview, Appellant terminated the interview.

Griggers acknowledged that it was reasonable to be unsure whether Appellant saw Bowie's gun. Griggers said the handle of the gun was revealed when Bowie lifted his shirt after getting on the elevator; he said that Appellant would have seen it while standing at Bowie's side, but that it was possible he did not. Griggers testified that covering their faces indicated this was no visit to pick up a girlfriend or typical drug deal, but preparation for a robbery. Griggers testified on cross-examination that Bowie confessed that he was communicating with Walker while she was in the room with Williams and that they went to the hotel planning to rob Williams. Griggers testified that it was possible that Appellant saw Haynes carrying a handgun and putting on a latex glove as they waited for Walker to leave Williams's room. Griggers testified that Haynes must have put on the glove while in the elevator or while waiting outside the room; Griggers reasoned that it was not likely that Appellant did not see the glove because

9

the trio were standing together and did not turn their backs to each other for more than a few seconds during that time. Griggers did not think that Bowie knocked on the door. He rejected Appellant's claim that he merely heard an explosion and did not know what it was.

Griggers testified that, when he was undercover, persons selling him drugs did not invite him to their room where they kept "their stuff," especially not when they could be outnumbered. "That's a good way to get robbed," he testified. He said that Walker's sharing of information with Bowie, the trio of men, the two guns, and Bowie and Haynes hiding their faces before they entered the room made it "clear that a robbery is taking place." He did not know whether anybody entered the room intending to kill Williams. Griggers opined further "[Y]ou don't just learn about that at the door. You learn about that in the car ride over . . . . [T]o indicate that [Appellant] had no idea what's going on is absurd. He is absolutely a party to the robbery and to the murder."

Appellant testified that he did not shoot Williams and that he did not engage in a conspiracy with either Bowie or Haynes to rob anybody. He said he and Bowie had lost touch while Appellant was in prison for five years. On the day of the murder, he was walking along the street while high on marijuana and ecstasy (about 8.5 out of 10 in intoxication level, he said), when Haynes and Bowie drove by and honked at him. Appellant said they decided to play some basketball and smoke some weed. He said Haynes drove to the hotel in about two or three minutes, but nobody explained why. He said there was not time to form a plan to rob anyone and that he was unaware that Bowie had a gun. Appellant said he had $100 in his pocket because he had cashed his paycheck and had been told that Williams had marijuana. He said he did not know what room they were going to and that Bowie was coming to pick up a girlfriend.

10

Appellant said Bowie and he knocked on the door separately. Appellant said he did not know Williams and got impatient when nobody came to the door.

Appellant testified that a girl came out of the room. He was standing at the door and did not remember stepping over the threshold. There was an explosion, and he ran because he did not know what happened. He thought maybe there was bomb packaging happening in the room. He thought the building might collapse. He said he ran because he wanted to get to safety for his family. He denied trying to hide his face. Instead of running to the car after getting outside, he ran through a hole in the fence and went to his sister's house. He testified that after learning that he was a person of interest he was advised by a lawyer not to go to the police; he said his choice not to turn himself in was not because he was guilty of any crime. He said he wanted to wait to go to police until after celebrating his birthday with family for the first time since going to prison.

Appellant admitted that after he was released on bond for the charges in this case, he cut off his ankle monitor and failed to report to the trial court; he said he regretted that. He said he cut off the monitor after he argued with his sister with whom he was living while on bond. He maintained that he was going to play basketball while high because he was accustomed to doing so with his friend in a non-competitive setting. He agreed that he was walking pretty normally on the video, but had experience being under the influence of drugs. Appellant said he did not see Haynes put on the latex glove. He agreed that it would be strange for Bowie to knock on the hotel room door of a person he was about to rob, but said "I'm not inside Mr. Bowie['s] head." He said that all he saw in the hotel room was the back of the shirt and head of the man in front of him.

Evaluating this testimony and evidence is a credibility choice left to the jury. *See Heiselbetz,* 906 S.W.2d. at 504. Applying the law to these facts involves drawing reasonable inferences using their common sense, knowledge, and experience—actions that are within the province of the jury. *Stahmann,* 602 S.W.3d at 577; *Eustis,* 191 S.W.3d at 884. Though the video and testimony might support conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination. *Merritt,* 368 S.W.3d at 525-26. We cannot reweigh the evidence and substitute our judgment for the jury's decisions but must determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Garcia,* 667 S.W.3d at 762; *Hooper,* 214 S.W.3d at 16-17.

Though Griggers had no direct knowledge of whether there was an agreement to rob Williams, what Appellant knew of that agreement, and whether he saw Bowie's gun, Griggers' testimony was largely based on the videos shown to the jury. The jurors could assess the video and testimony for themselves and use their own experience to assess the accuracy of Griggers's observations and the reasonableness of his conclusions. They could balance that assessment against Appellant's testimony and its internal inconsistencies and conflicts with Griggers's testimony—e.g., did Appellant knock on the door? step into the room briefly? know why they were going to the hotel or that they were picking up Walker? think that they were going to buy marijuana from Williams? know of Bowie's confessed plan to rob Williams? Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient to support the jury's verdict that Appellant was part of a conspiracy to commit aggravated robbery; that in furtherance of the attempt to carry out the aggravated robbery, one of

12

the men committed murder; and that murder should have been anticipated as a result of the carrying out of the aggravated robbery. *See Ervin*, 333 S.W.3d at 201.

We overrule the sole issue on appeal.

## CONCLUSION

We affirm the judgment of conviction.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   August 15, 2025

Do Not Publish

13