**AFFIRMED as MODIFIED and Opinion Filed November 6, 2019**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-18-00941-CR**

**ANTHONY RASHAD GEORGE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1676714-S**

# MEMORANDUM OPINION

Before Justices Bridges, Molberg, and Partida-Kipness
Opinion by Justice Bridges

Appellant Anthony Rashad George was indicted for murder in the course of committing and attempting to commit robbery. A jury found him guilty, and the trial court sentenced him to life in prison without parole. Appellant raises five issues on appeal. He challenges the sufficiency of the evidence to support his conviction for capital murder as a principal or party. He further contends the trial court abused its discretion by (1) denying a jury instruction on the lesser-included offense of robbery; (2) denying a motion for mistrial; and (3) overruling an objection to the State's impermissible argument during closing. Lastly, appellant and the State request modification of the judgment for various clerical errors. We modify the trial court's judgment and affirm as modified.

## Background

Decedent checked into the Le Meridian hotel in far North Dallas on November 24, 2016. He had a large sum of cash with him from the recent settlement of a lawsuit. His father estimated the settlement was about $30,000. Decedent locked the money in the safe inside his room.

The next two days, decedent ingested various drugs and alcohol while staying in his hotel room. In the early morning of November 27, 2016, decedent sought female companionship from an online website. Jessica Ontiveras answered his request and went to the hotel. She described decedent as "a little bit intoxicated" from consuming methamphetamine, GHB, cocaine, and alcohol. Jessica took some cocaine to gain his trust.

Decedent wanted another woman to join them so Jessica invited Rachel Burden. The record is conflicting as to whether decedent knew Rachel prior to this meeting. The women, however, knew each other through appellant. Jessica met appellant when she was twenty years old and working at a strip club. After a few months they moved in together, and she continued working as a prostitute. Appellant knew and supported her lifestyle; however, he never became a part of her business except to sometimes drive her to appointments. Rachel met appellant on Instagram. He knew she was a prostitute, and she moved to Texas to work for him. She wanted protection after a bad experience, and she believed he would protect her.

Rachel and Jessica spent a few hours with decedent, and he paid Jessica $700 and Rachel $500 for the appointment. He paid in one hundred dollar bills, and Rachel noticed he retrieved the money from the closet where the safe was located.

After their appointment, appellant picked them up. During the ride, Rachel commented there was about $8,000 in the room and they would go back. Jessica knew Rachel liked "hitting licks" or robbing her clients.[1]

Decedent later contacted Rachel and asked the women to return. Appellant dropped Rachel off. Decedent met Rachel on the seventh floor and then used his key card to go up to his room on the tenth floor. He paid her $500 up front. They used drugs and hung out. Jessica returned after her other appointment.

The women left once more, but returned for a third time at decedent's request. Jessica described decedent as acting paranoid and crazy. His behavior was becoming more erratic. He locked the hotel door and pulled a dresser in front of it obstructing them from leaving. Rachel told him she needed to make a phone call so he moved the dresser. Rachel left and never returned.

Surveillance video showed appellant and Range entering the hotel. Appellant had changed clothes from his earlier trip to the hotel in which he wore a white shirt and jacket. When he arrived this time, he wore a black hoodie, pants, different shoes, and gloves.

Rachel saw appellant on her way outside. He instructed her to walk up the street. Shortly thereafter, she texted appellant and told him to be careful because she "knew he was going up there to rob him." They had not discussed it, but "it was kind of obvious . . . I knew what was going to happen." She told appellant to take the phone cords from the room so decedent could not call anyone after he left. She did not know, however, that decedent would die during the robbery. But she admitted that by her third visit, the plan was for appellant to go to the room and take decedent's money.

Rachel also texted Jessica and said Rodney Range and appellant were on their way up to the room. Jessica did not know Range.

---

[1] During trial, Rachel denied Jessica's allegation.

Left alone with decedent behaving erratically, Jessica decided to act like everything was normal. Jessica thought if she got him undressed, she would be able to leave because he would not chase her. She succeeded in getting him undressed.

According to Jessica's trial testimony, when Range and appellant opened the door, decedent ran towards them. Range put decedent in a choke hold and fought him over to the bed where he eventually put zip ties around decedent's hands and feet. She claimed appellant was "just standing there" trying to calm her down because she was "freaking out." Range then started going through decedent's belongings and tossing items around the room. They did not succeed in breaking into the safe. They did, however, steal decedent's watch and cell phone.

After approximately seventeen minutes, appellant and Range left.[2] They told Jessica to wait a few minutes before leaving. She waited about thirty seconds. When she left the room, decedent was still tied up, face down on a pillow, and unconscious on the bed.

Jessica met appellant and Rachel outside, and the three drove away. Rachel noticed blood on appellant's face, but she did not see any injuries. Later, she overheard appellant and Range discussing the watch they stole from decedent.

Around 5 p.m., a housekeeper at the hotel noticed the door to room 1015 was open but also had the "do not disturb" sign posted. The door did not appear to be damaged.

When she went to room 1016 to clean, she heard the television from room 1015 at full volume, which was "strange." After she finished cleaning room 1016, she went inside room 1015. She saw decedent tied up, unclothed, facing down. The room was a mess. She did not know if he was alive, but quickly left and called the front desk from another room.

Officer Philip DeHoyos responded to the call from the hotel. Dallas Fire and Rescue were already on the scene when he arrived. Based on his initial observation of the room, he knew the

---

[2] Video surveillance shows the men leaving the hotel at 3:14 p.m.

victim was deceased. He then worked to secure the scene and called for a medical examiner. He noticed trash all over the room and saw "a white male who was naked with his hands bound behind his back with zip ties, as well as zip ties around his ankles" and hunched over a bed. He also observed a pillow covered with blood. Once he determined the scene was a possible homicide, he called Detective Derick Chaney.

Detective Chaney arrived around 7:30 p.m. Based on the state of the room, he believed a physical altercation occurred and "maybe someone was looking for property, and murder occurred." Based on the blood pattern on the wall and headboard, he believed the blood came from the impact of an object to the victim. He also believed the zip ties on decedent's hands, which he could not have put on himself, prevented him from moving.

Detective Chaney worked with the hotel staff to open the safe in the room. The safe contained $17,700 (a receipt indicated decedent had received $27,000). The phone had been unplugged and drug paraphernalia was observed in the room.

Detective Chaney obtained surveillance videos from the hotel. In one video, he observed a man dressed in black toss a cell phone in a sewer drain on the side of the hotel. Detective Chaney recovered the cell phone, which belonged to decedent.

Detectives observed blood on the railings and against the walls of the staircase leading down from the tenth floor to the first floor. Video surveillance captured appellant, Range, and Rachel leaving the hotel. There was no video showing Jessica leave.

Dr. Beth Frost, a medical examiner, performed the autopsy. She observed multiple abrasions and contusions to decedent's body, including bruising over the upper and lower eyelids and along his left cheek. The bruising indicated some sort of blunt object or impact to the skin. She noted multiple bruises and cuts inside his mouth, one of which tore all the way through the left side of his lip and into the lower part of the left cheek. The impact to his mouth also resulted

in a broken tooth. A bone in decedent's skull, located underneath the deepest cut on the left side of his forehead, was chipped. She observed hemorrhages inside the eye lid and pinpoint hemorrhages along the interior neck and on his chest. She surmised those injuries were caused from blunt force trauma, not from laying face down in a pillow.

Frost testified that the large quantity of blood found on the pillow was relevant to cause of death because decedent was found face down on the pillow with his nose and mouth obstructed. The bruising on his neck, chest, and eyes were consistent with "some asphyxia component," meaning lack of oxygen or blood flow.

She concluded decedent died as a result of homicidal violence including asphyxia and blunt-force injuries. The most significant blunt-force injury was the laceration through his forehead that chipped the skull. This would have rendered him unconscious. She could not say whether the injuries were caused by more than one person.

Shortly after the murder, appellant and Rachel fled to Las Vegas. Jessica met them shortly thereafter. Based on latent fingerprints lifted from decedent's hotel room, officers identified Rachel and Jessica and eventually arrested them in Las Vegas. The State indicted all four for capital murder. A jury convicted appellant of capital murder, and the trial court sentenced him to life in prison.

## Sufficiency of the Evidence

In his first issue, appellant argues the evidence is legally insufficient to establish he murdered decedent or should have anticipated that Range, his accomplice in the robbery, would murder him. The State responds the evidence is sufficient to establish appellant's guilt as a principal or party.

In a legal sufficiency review, we consider the evidence in the light most favorable to the verdict. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc.). The jury is entitled

to resolve any conflicts in evidence, to evaluate witness credibility, and to determine the weight to be given any particular evidence. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). If any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, we affirm the conviction. *King*, 29 S.W.3d at 562.

The court instructed the jury it could convict appellant of capital murder on any of these bases: (1) as the principal actor; (2) as a party to the offense; or (3) under conspirator liability. The jury returned a general verdict of guilty for capital murder; therefore, we must affirm the conviction if the evidence is sufficient to support the verdict under any of the bases. *Whitmire v. State*, 183 S.W.3d 522, 526 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Section 19.03 of the penal code makes it a capital offense to intentionally commit murder while in the course of a robbery or attempted robbery. TEX. PENAL CODE ANN. § 19.03(a)(2). Even if a defendant does not commit murder himself, he may be found guilty as a party to the crime if he acts with the intent to promote or assist in the commission of the murder. *Id.* § 7.02(a)(2). He may also be liable as a conspirator if there was a conspiracy to commit a robbery and a co-conspirator committed a reasonably foreseeable murder in furtherance of the conspiracy. *Id.* § 7.02(b).

Appellant does not deny his presence at the scene, but denies his participation in the murder. When a party is not the "primary actor," the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct. *Miller v. State*, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet. ref'd). The evidence can be deemed sufficient to sustain a conviction under the law of the parties if the evidence shows the defendant was physically present at the commission of the offense and encouraged the commission of the offense either by words or other agreement. *Id.*

In reviewing the sufficiency of the evidence to support appellant's participation as a party, we may consider "events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *King*, 29 S.W.3d at 564. Since an agreement between parties to act together in a common design can seldom be proved by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense. *Miller*, 83 S.W.3d at 314. Finally, while mere presence at the scene, or even flight, is not enough to sustain a conviction, such facts may be considered in determining whether an appellant was a party to the offense. *Id*.

Here, the jury could have reasonably found appellant guilty as a principle, party or co-conspirator. First, viewing the evidence in the light most favorable to the verdict, a jury could have determined appellant intentionally killed decedent in the course of committing robbery. Jessica told Detective Sayers and Detective Chaney in an interview prior to trial that appellant was the aggressor in the hotel room fight. She said appellant attacked decedent and was pushing and "swinging on" him. He helped get decedent under control before Range put him in a choke hold.

The medical examiner testified that based on her autopsy findings, decedent could have died from the blunt force trauma to his head that the jury could reasonably conclude occurred when appellant attacked him either before or after he was tied up. Or, they could have reasonably concluded decedent died from asphyxiation after appellant left him face down on a pillow, tied up, in a pool of his own blood.

Rachel testified appellant had blood on his face when he returned to the car and no visible injuries. A jury could reasonably infer it was decedent's blood from appellant killing him.

Despite Jessica's conflicting testimony regarding appellant's involvement in the murder, the jury weighed her credibility and any conflicts and found in favor of the State. Viewing the

evidence in the light most favorable to the State, a rational jury could have found appellant guilty of capital murder as a principal.

A reasonable jury could have likewise determined appellant acted as a party or co-conspirator to murder in the course of committing robbery. The jury heard testimony that the women made several trips to decedent's hotel room throughout the day and knew he had a large sum of cash in his hotel room safe. During one of their car rides from the hotel, Rachel told appellant she thought it was about $8,000.

Jessica and Rachel testified the plan was to rob decedent. The jury could reasonably infer appellant was the mastermind behind the plan. He was the common link between the women and Range. He knew a large sum of cash was in decedent's hotel room. The women had warned him that decedent was behaving erratically; therefore, the jury could reasonably infer appellant recruited Range, who was a large man, to help him because he anticipated decedent might put up a fight. In fact, the men arrived with zip ties further indicating their willingness to restrain decedent, if necessary, to carry out the plan.

When appellant arrived at the hotel for the last time, he parked on the side of the hotel near trees rather than near the taxi stand as he had done previously. Surveillance video showed he changed clothes in a likely attempt to conceal his identity. He wore gloves and used his elbow to push elevator buttons to not leave his fingerprints. After the men entered the room, they turned up the volume on the television to mask any noise. *See, e.g., King*, 29 S.W.3d at 554 (jury may consider defendant's actions before commission of offense in determining guilt).

Based on appellant's actions after the crime, the jury could have reasonably inferred his guilt. *Id*. Appellant left decedent rather than calling police to admit to a robbery that allegedly went farther than expected. *See Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *8 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (not designated for publication) (failure to contact

–9–

police indicates consciousness of guilt).  Appellant disconnected the telephone in the hotel room and took decedent's cell phone hindering his ability to call for help if he regained consciousness and somehow untied himself.  Appellant tossed the cell phone in a drain near the hotel while leaving the scene.  Attempts to destroy or conceal evidence is evidence of a guilty conscious.  *See Nisbett v. State*, 552 S.W.3d 244, 267–68 (Tex. Crim. App. 2018).  Appellant left Dallas a few days later and went to Las Vegas.  *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt.").

Even if appellant did not actually kill decedent, he should have anticipated that Range might react violently when confronted by decedent after barging into the hotel room.  *See, e.g., Moore v. State*, 24 S.W.3d 444, 447 (Tex. App.—Texarkana 2000, pet. ref'd) (evidence sufficient to support conviction of defendant's participation in crime as co-conspirator and result should have been anticipated).  Thus, the cumulative effect of the incriminating evidence would permit a rational jury to find beyond a reasonable doubt that, in an attempt to carry out a conspiracy to commit robbery, Range committed capital murder in furtherance of the unlawful purpose, and that appellant should have anticipated the capital murder as a result of the carrying out of the conspiracy.  *See, e.g., Owolabi v. State*, 448 S.W.3d 148, 153 (Tex. App.—Houston [14th Dist.] 2014, no pet.).  Viewing the direct and circumstantial evidence in the light most favorable to the State, a rational jury could find beyond a reasonable doubt that appellant was guilty of capital murder as a party or co-conspirator.  Appellant's first issue is overruled.

### Lesser-Included Offense Jury Instruction

Appellant next argues he was entitled to a jury instruction on the lesser-included offense of robbery, and he was harmed by the omission.  The State responds the trial court did not abuse its discretion by denying appellant's requested instruction.

–10–

Courts apply a two-prong test to determine whether a defendant is entitled to an instruction on a lesser-included offense. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). First, the court determines if the proof necessary to establish the charged offense also includes the lesser offense. *Id.* It is undisputed robbery is a lesser-included offense of murder. *See Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim. App. 2001) (robbery is contained within the proof for murder in the course of robbery). Under the second step, the court considers whether there is some evidence that would permit a rational jury to find that, if appellant is guilty, he is guilty only of the lesser offense. *Cavazos*, 382 S.W.3d at 383. This step is a question of fact and based on the evidence presented at trial. *Id.* A defendant is entitled to an instruction on a lesser-included offense if some evidence from any source raises a fact issue on whether he is guilty of only the lesser offense, regardless of whether the evidence is weak, impeached, or contradicted. *Id.*; *see also Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985) (en banc).

Appellant relies on the testimony of Jessica and Rachel to support his argument that some evidence exists showing he was guilty of only the lesser-included offense of robbery, and therefore, was entitled to the lesser-included offense instruction. Jessica testified appellant was "just standing there" trying to calm her down while Range beat decedent. Rachel testified she thought appellant was only going to rob decedent, and "[i]t was never for anybody to get hurt."

We disagree this testimony entitled appellant to a lesser-included offense instruction. The jury was instructed on a conspiracy theory of liability for murder in the course of committing robbery. As such, the second prong of the lessor-included offense test is met only if there is evidence in the record showing (1) there was no murder; (2) the murder was not committed in furtherance of a conspiracy; or (3) the murder should not have been anticipated. *Soloman*, 49 S.W.3d at 369.

–11–

It is undisputed a murder occurred, and appellant has not argued the murder was not in furtherance of a conspiracy. Rather, he argues that because the women testified he did not participate in the murder and they never intended anyone to die, the murder should not have been anticipated. Whether appellant or a co-conspirator intended to kill decedent before the robbery took place is irrelevant if the relevant liability elements were established at the time the crime was committed. *Id.*; *see also Rousseau v. State*, 855 S.W.2d 666, 674 (Tex. Crim. App. 1993) (en banc) ("There is no requirement in the case of capital murder committed in the course of a robbery, that the intent to cause death be premeditated or formulated prior to the commission of the robbery."). Moreover, there is no evidence that decedent's death was not in furtherance of a conspiracy to commit murder and no evidence his death was not anticipated or that it should not have been anticipated. *Soloman*, 49 S.W.3d at 369. To the contrary, when one decides to steal property from another, he should anticipate he or his co-conspirator might be confronted by that individual and that his co-conspirator might react violently to that confrontation. *See Allen v. State*, No. 05-03-00196-CR, 2004 WL 1637885, at *7 (Tex. App.—Dallas July 23, 2004, no pet.) (not designated for publication); *see also Moore v. State*, 24 S.W.3d 444, 447 (Tex. App.—Texarkana 2000, pet. ref'd). Accordingly, appellant was not entitled to a lesser-included offense instruction. We overrule his second issue.

**Improper Jury Arguments**

In his third and fourth issues, appellant challenges the State's improper jury arguments during closing. The State responds its arguments fell within the proper bounds of jury argument.

During closing argument, the State claimed, "It is absolute[ly] foreseeable that any robbery is gonna result in murder." The court sustained defense counsel's objection that the statement was improper and outside the record, granted counsel's request that the jury be instructed to disregard, but denied his motion for mistrial.

The denial of a motion for mistrial is reviewed for an abuse of discretion. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

A mistrial is an extreme remedy and should be exceedingly uncommon. *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). A mistrial is required only when the impropriety is clearly calculated to emotionally inflame the jurors' minds and is of such a character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds, or when the impropriety is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id*.

Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial, and we generally presume a jury follows the judge's instructions. *Id*. Thus, only in the most egregious cases where there is an "extremely inflammatory statement" is an instruction to disregard improper argument considered an insufficient response by the trial court. *Id*. Otherwise, the court of criminal appeals "has tended to find [a curative] instruction to have force." *Moore v. State*, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999).

We balance three factors in determining whether the trial court abused its discretion by denying a motion for mistrial: (1) the severity of the conduct; (2) the curative measures taken by the trial court; and (3) the certainty of conviction absent the conduct. *Archie*, 340 S.W.3d at 739.

Considering the first factor—severity of the misconduct—a statement indicating the foreseeability that *any* robbery will result in murder is inappropriate. Nonetheless, the offending statement must be "extremely inflammatory" to cause an instruction to disregard to be ineffective and require a mistrial. *Williams*, 417 S.W.3d at 176–77. While we do not condone the statement, it falls short of "extremely inflammatory." Further, the record does not indicate the State's remark

constituted a willful and calculated effort to deprive appellant of a fair and impartial trial. *See Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (en banc).

The second factor—measures taken to cure the misconduct—also supports a conclusion the trial court did not abuse its discretion by denying the motion for mistrial. During voir dire, the jury was told evidence does not come from the attorneys, and it does not matter "how many times they say it." The State also told jurors near the beginning of closing argument, "The evidence comes from the witness stand. . . . nothing from these tables over here is evidence. Nothing." The court's written instructions advised the jury it should not "refer to or discuss any matter or issue not in evidence." And finally, the trial court immediately ordered the jury to disregard the statement. Thus, we can presume from the cumulative weight of these instructions that the jury understood the State's improper comment was not evidence and should not be considered in its decision. Despite appellant's assertion that the statement relieved the State of its burden on a hotly contested issue and an instruction to disregard was insufficient, we cannot agree. Only offensive and flagrant error warrants reversal when there has been an instruction to disregard, and, in this case, the comment was not so flagrant that the instruction to disregard was ineffective.

The third factor—certainty of conviction absent the misconduct—likewise indicates no abuse of discretion. As detailed in our sufficiency review of the evidence, ample evidence supported the jury's guilty verdict.

After reviewing the record as a whole, the State's remark was not of the tenor to require a mistrial. And there is no evidence suggesting the jury considered the improper remark or that it ignored the court's instruction to disregard. A reasonable trial judge could have concluded its instruction cured the prejudice caused by the State's improper argument. Balancing all the factors, we conclude the trial court did not abuse its discretion by denying the motion for mistrial. We overrule appellant's third issue.

In his fourth issue, appellant argues the trial court abused its discretion by overruling his objection to the State's improper argument during closing rebuttal that "[t]he evidence is clear to assume that one person couldn't have done this." The State responds the argument was a proper summation or deduction from the evidence. Alternatively, error, if any, was harmless.

Prior to the objectionable statement, the State argued, "You think just one person went in there and was able to zip tie him?" Appellant did not object. When a defendant objects to one instance of an improper argument, but fails to object to other instances of the same or similar argument, he waives his complaint. *See Ross v. State*, No. 01-16-01011-CR, 2018 WL 1056409, at *6 (Tex. App.—Houston [1st Dist.] Feb. 27, 2018, no pet.) (mem. op., not designated for publication); *see also Temple v. State*, 342 S.W.3d 572, 603 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013). Because appellant failed to object to a similar statement, he failed to preserve his issue for review. However, even if his issue was preserved and we assume it was improper, appellant cannot establish harm.

Improper argument is non-constitutional error that must be disregarded unless it affects a defendant's substantial rights. *See Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008); *see also* TEX. R. APP. P. 44.2(b). Error is not reversible unless, in light of the record, the argument is extreme or manifestly improper and affects a defendant's substantial rights. *Id*. We balance the severity of the misconduct, any curative measures, and the certainty of conviction absent the misconduct. *Id*. In evaluating the severity of any misconduct, we must assess "whether [the] jury argument is extreme or manifestly improper by looking at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *Id*. (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997) (en banc)).

Although there were no curative measures, such as an instruction to disregard, the objectionable statement was not a willful and calculated effort by the State to deprive appellant of a fair and impartial trial. Viewing the State's closing argument and the record as a whole, we cannot conclude that appellant was prejudiced by the remarks. Moreover the certainty of conviction absent the misconduct remains unchanged. Appellant's fourth issue is overruled.

## Reformation of Judgment

In his final issue, appellant argues the judgment should be reformed to correct the offense, his attorneys' names, and his sentence. The State agrees the judgment should be reformed and further asks the Court to modify the judgment to include a deadly weapon finding.

This Court has the power to modify a judgment to make the record speak the truth when we have the necessary information to do so. TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd); *Barnes v. State*, No. 05-16-01184-CR, 2017 WL 5897746, at *6 (Tex. App.—Dallas Nov. 29, 2017, no pet.) (mem. op., not designated for publication). This includes the correction of counsel's name. *See Hooks v. State*, No. 05-15-00186-CR, 2016 WL 3541542, at *3 (Tex. App.—Dallas June 21, 2016, no pet.) (mem. op., not designated for publication). The judgment incorrectly states defense counsel as Daniel Eckstein. Based on the record, the judgment should be reformed to indicate Scottie Allen and Lysette Rios represented appellant.

The judgment incorrectly states appellant was found guilty of "capital murder terroristic threat." Based on the indictment and the jury's guilty verdict, the judgment should be reformed to indicate he was found guilty of capital murder in the course of committing or attempting to commit robbery. *See, e.g., Jackson v. State*, 288 S.W.3d 60, 64 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (reforming judgment to reflect correct offense).

The judgment should be further reformed to reflect that the trial court assessed punishment rather than the jury. *See, e.g., Martinez v. State*, No. 14-10-00552-CR, 2011 WL 1601313, at *3 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (mem. op., not designated for publication) (reforming judgment to correct judge, rather than jury, assessed punishment).

In a cross-issue, the State asserts the judgment should be reformed to reflect a deadly-weapon finding. For a trial court to enter a deadly-weapon finding in the judgment, the trier of fact must first make an affirmative finding to that effect. *See Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016). Courts do not look to the facts of the case to "imply" an affirmative deadly weapon finding but look to the charging instrument, the jury charge, and the jury verdict to evaluate the propriety of an entry of a deadly weapon finding by the jury. *Id*.

There are three formal ways a jury makes this affirmative finding: (1) the indictment specifically alleged a "deadly weapon" was used (using the words "deadly weapon") and the defendant was found guilty "as charged in the indictment"; (2) the indictment did not use the words "deadly weapon" but alleged use of a deadly weapon per se (such as a firearm); or (3) the jury made an express finding of fact of use of a deadly weapon in response to submission of a special issue during the punishment stage of trial. *Id*.; *see also Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985) (en banc).

Here, the charging instrument stated appellant caused decedent's death "by striking complainant with a hand and kicking the complainant." The indictment was later amended to include "and suffocating with a pillow and squeezing complainant's neck with a hand and arm." The jury was instructed to find appellant guilty of capital murder "as charged in the indictment" if it believed beyond a reasonable doubt that appellant "acting alone or as a party, intentionally caused the death of [decedent], an individual, by striking [decedent] with a hand, or kicking [him], or suffocating [him] with a pillow, or squeezing [his] neck with a hand or arm . . . ."

The statutory definition of "deadly weapon" includes "anything that in the manner of its use . . . is capable of causing death . . . ." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). The medical examiner testified a pillow can cause someone to die. She also testified hands, feet, and someone squeezing a person's neck can cause death. Having found appellant guilty of capital murder, the jury necessarily found that he used something that in the manner of its use was capable of causing—and did cause—death. *See Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009); *see also Walker v. State*, No. 05-13-01082-CR, 2014 WL 5477049, at *2 (Tex. App.— Dallas Oct. 29, 2014, no pet.) (mem. op., not designated for publication) ("Because the jury found Walker guilty of aggravated assault, it necessarily found the commission of assault involved the use or exhibition of a deadly weapon."). Accordingly, we modify the trial court's judgment by deleting "N/A" and replacing with "Yes" under "Deadly Weapon Finding."

Lastly, while reviewing the judgment, we observed another clerical error. The judgment fails to list the State's attorneys. The parties do not address this on appeal, but we may sua sponte reform the judgment when we have the necessary information to do so. *Asberry*, 813 S.W.2d at 530. Thus, we reform the judgment to indicate that Brooke Grona-Robb and Marcia Taylor represented the State at trial.

Accordingly, we sustain appellant's fifth issue and reform the judgment to reflect the proper offense, defense counsels' names, and his sentence. We sustain the State's cross-point and reform the judgment to include a deadly weapon finding. Finally, we sua sponte reform the judgment to reflect the State's attorneys.

## Conclusion

As modified, we affirm the trial court's judgment.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180941F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANTHONY RASHAD GEORGE,
Appellant

No. 05-18-00941-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1676714-S.
Opinion delivered by Justice Bridges.
Justices Molberg and Partida-Kipness
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Under Findings on a Deadly Weapon, we DELETE "N/A" and REPLACE with "Yes."

We **DELETE** "Daniel Eckstein" as attorney for defendant and **REPLACE** with "Scottie Allen and Lysette Rios."

We **INSERT** Brooke Grona-Robb and Marcia Taylor as attorneys for the State

Under "Offense for which Defendant Convicted," we **DELETE** "Capital Murder Terrorist Threat" and **REPLACE** with "Capital Murder Robbery."

Under "Punishment Assessed by," we **DELETE** "Jury" and **REPLACE** with "Trial Court."

As modified, the judgment of the trial court is **AFFIRMED**.

Judgment entered November 6, 2019